# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

| | |
|---|---|
| NATHANIEL J. NOLAN and HELENA WITTENBERG, individually and on behalf of a class of persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LABORATORY CORPORATION OF AMERICA HOLDINGS, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO. 1:21-cv-979

JURY TRIAL REQUESTED

## COMPLAINT – CLASS ACTION

Nathaniel J. Nolan and Helena Wittenberg, individually and on behalf of all others similarly situated ("Plaintiffs"), bring this class action complaint against Laboratory Corporation of America Holdings, inclusive of all subsidiaries and affiliates ("Labcorp"). Plaintiffs' allegations are based upon information and belief, including the investigation of counsel, except as to the allegations that pertain to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1.     Plaintiffs file this action, as a related action to *Anderson v. Laboratory Corporation of America Holdings,* Case No. 1:17-cv-193(M.D.N.C.), to bring Labcorp's Patient Acknowledgement of Estimated Financial Responsibility form (the "Patient

Acknowledgement") before the Court. The Patient Acknowledgement came into use by Labcorp on or about the date of filing of the Amended Complaint in *Anderson* on August 10, 2018 (ECF 42), and accordingly is not referenced in that Amended Complaint. This action is also filed to toll the statute of limitations and to seek relief under the Nevada Deceptive Trade Practices Act and Florida Deceptive and Unfair Trade Practices Act.

2. This action is brought as a class action on behalf of Nevada and Florida residents who signed a Patient Acknowledgement disclosing the "Estimated Charges" for lab services, but were billed a patient list price ("PLP") for those services that exceeded the disclosed "Health Plan Allowed Rate" for those services. A copy of the Patient Acknowledgement signed by Nolan on September 1, 2018 is annexed as Exhibit A. Copies of the Patient Acknowledgments signed by Wittenberg on April 16, 2018 are annexed as Exhibits B and C.

3. The Patient Acknowledgment is part of a continuing course of conduct practiced by Labcorp on its patients to overcharge them based on an excessive patient list price without first disclosing those prices to them. Specifically, the Patient Acknowledgment advises patients in prominent type-face of their financial responsibility to pay a negotiated "Health Plan Allowed Rate." The Patient Acknowledgment adds in very small print that "your health plan may not pay for [Labcorp's] services" and "the amount you may have to pay [*i.e.,* the PLP] may be different than the estimated amount." In fact, Labcorp knows and fails to disclose that the amount that it bills patients if insurance does not cover the test is many multiples (frequently more than ten times greater) than the disclosed amount.

Case 1:21-cv-00979-TDS-JLW   Document 1   Filed 12/29/21   Page 2 of 45

4.     On September 1, 2018, Labcorp administered Nolan a Vitamin D, 25-hydroxy test.  Prior to being administered that test, Nolan signed a Patient Acknowledgement form acknowledging that his financial responsibility, based on his health plan's "Allowed Rate," was $18.93.  Although the Patient Acknowledgement form disclosed in very small print that Nolan's health insurance company may deny coverage for the test and that the actual cost for the test "may be different than the estimated amount," Labcorp had actual knowledge at that time and failed to disclose to Nolan that if his insurer denied coverage, Labcorp would bill Nolan a patient list price of $292 that was 15.4 times the disclosed $18.93 "Health Plan Allowed Rate."

5.     Nolan's health plan did subsequently deny coverage and Labcorp subsequently billed Nolan the $292 patient list price.  Nolan has paid Labcorp the estimated charge of $18.93 towards the cost of that test (and has otherwise refused to pay the undisclosed $292 patient list price absent an appropriate settlement of his claim).

6.     Because of his refusal to pay Labcorp's undisclosed $292 patient list price, Nolan has been subjected to a number of aggressive collection practices, including Labcorp reporting his "debt" to a credit rating agency.

7.     On April 16, 2018, Wittenberg was administered clinical laboratory tests at a Labcorp PSC prescribed by two different doctors and signed two separate Patient Acknowledgement forms.  The first set of lab tests consisted of a Lipid Panel, General Health Panel, and HGB, Glycated [Hemoglobin A1c] test.  Prior to being administered those tests, Wittenberg signed a Patient Acknowledgement stating that her total financial responsibility, based on her health plan's "Allowed Rate," was $44.60 as follows:  Lipid

Panel ($7.88), General Health Panel ($28.92), and HGB; Glycated [Hemoglobin A1c] ($7.80).

8.      The second set of lab tests consisted of a second General Health Panel, a second Lipid Panel, a T4; free test, a T3; free test and a second HCB; Glycated [Hemoglobin A2c] test. Prior to being administered those tests, Wittenberg signed a Patient Acknowledgement stating that her total financial responsibility, based on her health plan's "Allowed Rate," was $65.27 as follows: General Health Panel ($28.92), Lipid Panel ($7.88), T4; Free ($6.16), T3; Free ($11.56), and HGB; Glycated [Hemoglobin A1c] ($7.80). Lipid Panel ($7.88), General Health Panel ($28.92), HGB; Glycated [Hemoglobin A1c] ($7.80), and blood draw ($2.95).

9.      Although the Patient Acknowledgement forms disclosed in very small print that Wittenberg's health insurance company may deny coverage for the tests and that the actual cost for the tests "may be different than the estimated amount," Labcorp had actual knowledge at that time and failed to disclose to Wittenberg that if her insurer denied coverage, Labcorp would bill Wittenberg on the first set of tests a patient list price of $335 that was 7.5 times the disclosed $44.60 "Health Plan Allowed Rate," and on the second set of tests a patient list price of $650 that was 9.96 times the disclosed $65.27 "Health Plan Allowed Rate."

10.     Wittenberg's health plan did subsequently deny coverage and Labcorp subsequently billed Wittenberg the $335 and $650 patient list prices, respectively. Wittenberg has paid Labcorp the initial disclosed amounts plus $140 towards the cost of

4

each bill (and has otherwise refused to pay the undisclosed patient list prices absent an appropriate settlement of her claim).

11.     Because of her refusal to pay Labcorp's undisclosed patient list prices, Wittenberg has been subjected to a number of aggressive collection practices, including Labcorp reporting her "debt" to a credit rating agency.

12.     The Patient Acknowledgement is a common form used throughout Labcorp's operations and is signed by thousands, if not millions, of class members a year. Labcorp engages in more than 160 million patient encounters per year, and typically processes clinical lab tests on more than 3 million patient specimens per week.

13.     Labcorp's business practice of disclosing to patient low negotiated insurance rates and then "surprising" them with excessive patient list prices if insurance denies coverage, is a common business practice that cries out for class action treatment. Labcorp baits patients with illusory estimates of their responsibility, then switches after the fact to charge them Labcorp's arbitrary list prices.

14.     Plaintiffs and the Class seek a declaratory judgment under the Nevada and Florida consumer protection laws that the Patient Acknowledgement form is materially misleading and deceptive, a permanent injunction barring the use of that form, and money damages on behalf of any class member who paid a patient list price not disclosed on the Patient Acknowledgement form in excess of the disclosed "Health Plan Allowed Rate." Plaintiffs and the Class also seek attorneys' fees and the expenses of this action.

Case 1:21-cv-00979-TDS-JLW   Document 1   Filed 12/29/21   Page 5 of 45

## JURISDICTION AND VENUE

15. Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1332(a)(1), which confers original jurisdiction upon this Court based on diversity of citizenship: (a) there are 100 or more Class members; (b) the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and (c) at least one Plaintiff and member of the Class is a citizen of a state different from Defendant.

16. This Court possesses personal jurisdiction over Defendant based on Labcorp's residence, presence, transaction of business and contacts within this District.

17. Venue is proper in this District pursuant to 28 U.S.C. §1391 because Labcorp maintains its principal place of business in this District, and at all times conducted substantial business herein.

## PARTIES

### A. PLAINTIFFS

18. Plaintiff Nathaniel J. Nolan is a resident of Reno, Nevada. At all relevant times, Nolan maintained health insurance through Highmark Blue Shield.

19. Plaintiff Helena Wittenberg is a resident of Lake Mary, Florida. At all relevant times, Wittenberg maintained insurance through her husband's employer (Veritas Technologies LLC).

### B. DEFENDANT

20. Labcorp is a Delaware corporation with its principal place of business and headquarters located at 358 South Main Street, Burlington, North Carolina. It is one of

the largest providers of clinical lab testing services in the world, with more than 72,000 employees and more than 160 million patient encounters each year. Labcorp 10-K for year ended December 31, 2020 (the "2020 10-K")[1]. Labcorp is the parent company of numerous subsidiaries that provide lab testing, patient billing and related services. Labcorp is a publicly traded company and is listed and traded on the New York Stock Exchange under the ticker symbol "LH."

## FACTUAL ALLEGATIONS

**A.    LABCORP AND THE CLINICAL LAB TESTING INDUSTRY**

21.    Typically, physicians write prescriptions for clinical lab tests and the specimens are collected at the physician's office or at a Labcorp location. Either way, Labcorp is provided with the medical diagnosis code and a test (CPT[2] or HCPCS[3]) code for each prescribed clinical lab test, as well as the patient's insurance information (for insured patients). If the service is covered by insurance, Labcorp bills the third-party payer and is paid the negotiated or government-mandated rate. If the service is not covered by insurance, Labcorp bills the patient at its patient list price.

---

[1] Plaintiff cites Labcorp's 2017 10-K (filed in February 2018), reflecting policies in effect at the time of Plaintiff's testing by Labcorp, and also cites Labcorp's 2020 10-K when necessary to include updated figures.

[2] "CPT code" means Current Procedural Terminology code, and is a set of medical codes for healthcare-related laboratory procedures, and is maintained by the American Medical Association.

[3] "HCPCS code" means Healthcare Common Procedure Coding System code, which is a major code set for healthcare services and was developed by the Centers for Medicare and Medicaid Services ("CMS").

7

22.     Third-party payers, and clients such as medical practices and hospitals, who contribute an overwhelming majority of Labcorp's diagnostic services net revenue, pay negotiated or government-mandated rates that are substantially lower than patient list prices.   For instance, the list price Labcorp charged Nolan for the Vitamin D test ($292) was more than fifteen times what it would have been paid by his insurer ($18.93).

23.     Labcorp's list prices grossly exceed costs.  In 2020, Labcorp reported a gross profit margin (reflecting the percent of net revenue after subtracting the cost of services) of approximately 35.4% (based primarily on negotiated rates).  2020 10-K at 13. Given the profitability of the negotiated rates, Labcorp's inflated patient list prices (10 times or more the negotiated rates) are excessively profitable.

24.     Labcorp is capable of advising its patients in advance and securing their consent to charge patient list prices.  For instance, Labcorp is required to disclose estimated charges with respect to Medicare patients when Medicare coverage is expected to be denied.[4]  This is completed through an Advanced Beneficiary Notice (ABN) form. Indeed, absent such disclosure, there is no meeting of the minds as to price.  Without a meeting of the minds, Labcorp is limited to charging the Health Plan Allowed Rate disclosed on the Patient Acknowledgement.

25.     Patients who refuse to pay are subjected to a host of aggressive and unlawful collection efforts.

---

[4] *See* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/abn_booklet_icn006266.pdf

Case 1:21-cv-00979-TDS-JLW   Document 1   Filed 12/29/21   Page 8 of 45

26. Patients receiving Labcorp's colossal bills are left with limited recourse given the lab tests have already been performed. Patients are forced to either pay Labcorp outrageous amounts or endure Labcorp's collection efforts, which include the potential foreclosure of Labcorp performing clinical lab testing services in the future, threats of the debt being sold to a collection agency, and the risk of a negative report being submitted to credit rating agencies.

B. **LABCORP'S BUSINESS MODEL**

27. Labcorp describes itself as "a leading global life sciences company that provides vital information to help doctors, hospitals, pharmaceutical companies, researchers, and patients make clear and confident decisions." 2020 10-K at 9. Labcorp "provides diagnostic, drug development and technology-enabled solutions for more than 160 million patient encounters per year, or more than 3 million patients per week. Labcorp also supports clinical trial activity in approximately 100 countries through its industry-leading central laboratory, preclinical, and clinical development business." *Id.*

28. Labcorp consists of two business segments: Labcorp Diagnostics (Dx), formerly referred to as Labcorp Diagnostics (LCD), and Labcorp Drug Development (DD), formerly referred to as Covance Drug Development (CDD). 2020 10-K at 9.

29. The Dx segment is labeled as "an independent clinical laboratory business." *Id.* at 13. More specifically, it "offers a comprehensive menu of frequently requested and specialty testing through an integrated network of primary and specialty laboratories across the U.S." *Id.* Labcorp's Dx segment provides "patient access points" around the U.S., "including more than 2,000 patient service centers (PSCs) operated by Dx and more

9

than 6,000 in-office phlebotomists [individuals who draw blood] who are located in customer offices and facilities." *Id.*

30.     Labcorp's DD segment "provides end-to-end drug development, medical device and companion diagnostic development solutions from early-stage research to clinical development and commercial market access." DD "offers deep expertise in early development and clinical trials in each therapeutic area." 2020 10-K at 16.[5]

31.     Labcorp's customers include "MCOs [managed care organizations], biopharmaceutical, medical device and diagnostics companies, governmental agencies, physicians and other healthcare providers, hospitals and health systems, employers, patients and consumers, contact research organizations (CROs), and independent clinical laboratories." 2020 10-K at 10.

32.     Additionally, "[i]f the billings are to the physician, they are based on a customer-specific fee schedule and are subject to negotiation. Otherwise, the patient or third-party payer is billed at Labcorp's patient fee schedule…." 2017 10-K at 19. Generally, only patients are responsible for paying Labcorp's patient list rates set forth on its patient fee schedule.

---

[5] This litigation is focused primarily on Labcorp's Dx segment. Therefore, unless otherwise indicated, all references to "Labcorp" are made in reference to the Dx business segment.

## C. LABCORP'S INTERNAL COST STRUCTURE

33.　　Labcorp's net revenue for the year ended December 31, 2020, was approximately $13.979 billion.  Of that figure, approximately $9.253 billion was contributed by the Dx segment.  2020 10-K at 50.

34.　　In relation to the overall net revenue of approximately $13.979 billion for 2020, the net "cost of revenues," which includes "primarily laboratory, labor and distribution costs,"[6] was $9.026 billion, or 64.6% of net revenues.  2020 10-K at 50.

35.　　Labcorp's gross profit was approximately $4.953 billion, providing a gross profit margin (reflecting the percent of revenue after subtracting the cost of services) of approximately 35.4% for 2020.  2020 10-K at 12.  Assuming conservatively that Labcorp's patient list prices are on average five times its negotiated or Medicare rates (and therefore that reported revenue of $13.979 billion would be multiplied by five, with the $9.026 billion cost of providing services staying the same), the gross profit margin on patient list prices would be 87.1% (1 - $9.026 billion divided into $69.895 billion).

36.　　When breaking down Labcorp's operating income by segment, the Dx segment was responsible for approximately $2.635 billion, or an operating margin of 28.5% for 2020.  2020 10-K at 52.[7]

---

[6] "Cost of revenue includes direct labor and related benefit charges, other direct costs, shipping and handling fees, and an allocation of facility charges and information technology costs."  2020 10-K at F-11.

[7] Labcorp does not break down gross profit by business segment.

Case 1:21-cv-00979-TDS-JLW   Document 1   Filed 12/29/21   Page 11 of 45

37.     Labcorp's net profit for 2020 was reported to be $1.557 billion, or 11.1% of revenue, compared to $824.9 million and $883.9 million for 2019 and 2018, respectively. 2020 10-K at F-5.

38.     The profitability of Labcorp is reflected in the pay of its Chief Executive Officer, Adam H. Schechter.  According to a Schedule 14A filed with the SEC on April 1, 2021, Schechter received total compensation of $14,735,561 in 2020.

39.     According to *Bloomberg*, as of December 20, 2021, Labcorp had 95.7 million common shares outstanding and a market cap of $29,610.5 billion.

**D.     LIST PRICES FOR HEALTHCARE SERVICES, GENERALLY**

40.     Within the healthcare industry, Labcorp and other healthcare service providers, such as hospitals and physicians, maintain fee schedules for their services, referred to as "list prices" or, in the hospital setting, "chargemaster rates."  The "defining feature [of a list price or chargemaster rate] is that it is 'devoid of any calculation related to cost' and is not based on market transactions."  Barak D. Richman, JD, PhD; Nick Kitzman, JD; Arnold Milstein, MD, MPH; and Kevin A. Shulman, MD, *Battling the Chargemaster: A Simple Remedy to Balance Billing for Unavoidable Out-of-Network Care*, The American Journal of Managed Care, Vol. 23, No. 4, e100-e105, at e101 (April 2017).  Indeed,

> [h]ospital accounting experts agree that hospital billing practices "encourage manipulation of the [chargemaster] to maximize revenue" and have created a "legal fiction" that now serves as the basis of billing uninsured and OON [out-of-network] patients.  In determining the amount that providers accept from third-party payers, "[c]hargemaster rates, in reality, serve nothing more than the [hospital's] starting point for negotiations."

12

*Id.* at e101 (citations omitted).

41. Another article discussing healthcare billing practices similarly found that "list or chargemaster prices are exorbitant and unfair, because they reflect prices that are set to be discounted and not paid." George A. Nation III, *Healthcare and the Balance-Billing Problem: The Solution Is the Common Law of Contracts and Strengthening the Free Market for Healthcare*, 61 Vill. L. Rev. 153, 153 (2016) (citing cases). For example, "chargemaster rates that hospitals claim are usual and customary are instead exorbitant amounts, arbitrarily set by hospitals, as a starting point for negotiating huge discounts with insurers." *Id.* at 154. Additionally, the list prices "bear no relationship to the hospital's cost, and, if they are paid, yield truly enormous profits to the hospital." *Id.* at 162. As a result, "while hospitals claim that the chargemaster rates reflect their usual and customary *charge* for services, they certainly do not represent the usual price actually *paid* for the listed goods and services." *Id.* at 158 n.28 (citation omitted and emphasis in original). In fact, "no sane person properly informed would agree to pay them." *Id.* at 187. Accordingly, "chargemaster or list prices are not fair or reasonable." *Id.* at 158 n.28.

42. Another article reached the same conclusion that list prices "often have no basis in either the cost of the service or in genuinely negotiated prices (the ones secured by insurers)." Mark A. Hall & Carl E. Schneider, *Patients as Consumers: Courts, Contracts, and the New Medical Marketplace*, 106 Mich. L. Rev. 643, 676 (2008). Indeed, "doctors' and especially hospitals' prices are so complex and arbitrary that

13

patients could not hope to understand them were they revealed." *Id.* at 666. As a result, "prices go beyond mere unreasonability and become unconscionable." *Id.* at 676.

43. Additionally, The New York Times released a report, dated May 8, 2013, summarizing findings from data released for the first time by CMS. This data "show[ed] that hospitals charge Medicare wildly differing amounts — sometimes 10 to 20 times what Medicare typically reimburses — for the same procedure, raising questions about how hospitals determine prices and why they differ so widely." Barry Meier, Jo Craven McGinty and Julie Creswell, *Hospital Billing Varies Wildly, Government Data Shows*, THE NEW YORK TIMES (May 8, 2013). According to the article, neither Medicare nor private insurers pay the chargemaster rates; it is the uninsured and those with inadequate insurance that are forced to pay these rates. As reported in The Times, "the people who can afford it least — those with little or no insurance — are getting hit with extremely high hospitals bills that may bear little connection to the cost of treatment." *Id.*

44. In his testimony before Congress on March 15, 2006, Gerard F. Anderson—a Professor in the Bloomberg School of Public Health and in the School of Medicine at Johns Hopkins University, as well as the Director of the Johns Hopkins Center for Hospital Finance and Management—explained:

> List prices are established by the hospitals and physicians without any market constraints. Too often list prices have no relationship to the prices that are actually being paid by insurers. The prices should reflect the market place and should not be dictated by only the hospitals and physicians.

What's the Cost?: Proposals to Provide Consumers with Better Information about Healthcare Service Costs, 109th Cong. 103, Serial No. 109-70 (March 15, 2006)

(testimony of Gerard F. Anderson, Director, Johns Hopkins Center for Health Finance and Management) (hereinafter, "Anderson Testimony") at 100.

45.     Professor Anderson continued, "***Under the current system hospitals and physicians have the ability to post any price they choose. There is not a requirement that anyone ever pays that posted price and in fact the posted price is seldom paid.***" *Id.* at 105 (emphasis in original).  This is because "***[t]he hospital or hospital system has complete discretion to set each and every charge on the charge master file.*** The hospitals often do not know how they set each charge on the charge master file."  *Id.* at 106 (emphasis in original).  Professor Anderson concluded that "***charges are not set by market forces or using a systematic methodology.***"  *Id.*

46.     TIME magazine published an extensive article that presented striking examples of the unreasonableness of list prices.  In one particularly relevant example, an individual was charged $15,000 for "blood and other lab tests" that, "[h]ad [the individual] been old enough for Medicare, [the lab service provider] would have been paid a few hundred dollars for all those tests."  Steven Brill, *Bitter Pill: Why Medical Bills Are Killing Us*, TIME, Feb. 20, 2013.  In attempting to decipher how the list prices were derived, the reporter "quickly found" that,

> although every hospital has a chargemaster, officials treat it as if it were an eccentric uncle living in the attic. Whenever I asked, they deflected all conversation away from it.  They even argued that it is irrelevant.  I soon found that they have good reason to hope that outsiders pay no attention to the chargemaster or the process that produces it.  For there seems to be no process, no rationale, behind the core document that is the basis for hundreds of billions of dollars in health care bills.

15

*Id.* As one hospital spokesman admitted, "[t]hose are not our real rates," and that the chargemaster list is simply "a list we use internally in certain cases, but most people never pay those prices. I doubt that [the CEO] has even seen the list in years." *Id.*

47.     As aptly stated in a Seton Hall Legislative Journal article:

> The stories are neither new nor surprising to the American public at large. These are stories of the excessive billing practices by American hospitals of the nation's uninsured - typically the segment of our population least able to pay for medical care. These billing practices and subsequent collection actions can be directly linked to increasing rates of personal bankruptcies caused by medical debt. They are also the source of the uninsured's reluctance to seek care due to the fear of facing bills so overwhelming that they cause financial ruin.

Tamara R. Coley, *Extreme Pricing of Hospital Care for the Uninsured*, 34 Seton Hall Legis. J. 275, 276 (2010).

**E.     LABCORP DOES BUSINESS WITHOUT WRITTEN AGREEMENTS OBLIGATING PATIENTS TO PAY PATIENT LIST PRICES**

48.     Labcorp's specimens are typically collected for testing at physicians' offices or Labcorp facilities. Labcorp customarily performs the lab testing services prior to processing the billing information and determining the anticipated price or financially responsible party. Price and paying party information is determined during the claims adjudication process, which involves potential third-party payers (*e.g.*, an insurance company) determining the extent of its financial responsibility on behalf of a patient. The price for third-party payers is generally derived from a negotiated fee schedule in place with the third-party payer for whom Labcorp is in-network.

49.     If the third-party payer decides to deny or reduce payment to Labcorp, this decision is typically based on the ground that lab testing services were either not covered

16

under the patient's health insurance plan, the billed service level was not appropriate for the medical diagnosis or procedure codes included on the claim submission, or that the test itself was either "experimental" or "investigational."

50.    With the exception of Medicare requirements, Labcorp does not enter into agreements in advance with patients that identify the patient list price patients will be requested to pay in the event the patient is financially responsible for making payment. Instead, Labcorp baits patients with illusory estimates of their responsibility, then switches after the fact to charge them Labcorp's arbitrary list prices.

## F.    DETERMINING THE ACTUAL MARKET RATE FOR CLINICAL LAB TESTING SERVICES

51.    A market rate is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts." *See* IRS Publication 561.

52.    The market rate for clinical lab testing services can be determined by analyzing the amounts *paid* by third-party payers who reimburse service providers on a fee-for-service basis, in contrast to the amounts *charged* for similar services, which are rarely paid and based on arbitrary, unilaterally imposed list prices.

53.    There is substantial support for this conclusion.  As Gerard Anderson testified before Congress:  "***prices need to be reasonable. By reasonable I mean the prices must reflect what is being paid in the market place.***"  *See* Anderson Testimony at 102 (emphasis in original).  The "standard of comparison to see if the amount is reasonable," and therefore reflective of market prices, must be based upon "what insurers

17

actually pay and what the [healthcare service providers] are willing to accept." *Id.* at 109. Because "virtually no public or private insurer actually pays full charges," list prices are "an unrealistic standard for comparison." *Id.* "The amount ***charged*** is determined solely by one party in the transaction – the [healthcare service provider]. ***It is not a market transaction***. The amount ***paid*** that is determined by both parties in the transaction is a reasonable amount. These are the rates determined in a negotiation between insurers and hospitals." *Id.* (emphasis added).

54.    As one article concluded, "[t]he fair and reasonable value of medical expenses must be based on the usual amount actually paid to the provider, not by the amount billed by the provider." *See Healthcare and the Balance-Billing Problem, supra* at 188. The paid amounts reflect market rates because "the prices chosen by health plans are probably best regarded as being determined by demand and supply," s*ee Patients as Consumers supra* at 661 (citation omitted), not a unilaterally imposed arbitrary figure that lacks any relation to cost or market forces and is rarely paid in reality.

55.    Healthcare service providers such as Labcorp are generally paid by private third-party payers (*e.g.*, insurers or hospitals) or government payers (*i.e.*, Medicare or Medicaid). The actual paid amounts are generally based on a negotiated rate or, in the case of government payers, a statutorily mandated rate.

56.    In June 2013, the United States Department of Health and Human Services ("HHS"), Office of Inspector General published a report, *Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings*, that analyzed payment data collected from 50 state Medicaid programs and three Federal Employees Health Benefits

18

(FEHB) plans that pay for clinical lab testing services on a fee-for-service basis. The data was collected for the period beginning on January 1, 2011, through March 31, 2011, and included 20 high-volume and/or high-expenditure lab tests. Upon an analysis of the data received, the Office of Inspector General found that Medicare was paying between 18- and 30-percent more than other insurers were paying for the same clinical lab testing services. HHS recommended that CMS "seek legislation that would allow it to establish lower payment rates for lab tests ...." In other words, Medicare had been *overpaying* for clinical lab testing services.

57. Thereafter, Congress passed the Protecting Access to Medicare Act of 2014 ("PAMA"), Pub. L. No. 113-93, 128 Stat. 1053 (2014). Under Section 216 of PAMA, codified at 42 U.S.C. § 1395m-1, Congress directed the Secretary of HHS to update the methodology by which Medicare reimbursed medical lab service providers for clinical lab testing services. The process for updating Medicare's reimbursement structure included two parts: (1) collecting payment data from certain laboratories that participated in the Medicare program, and (2) relying upon the payment data collected to establish a new CLFS.

58. Prior to implementing PAMA, *e.g.*, for calendar year 2017, Medicare paid for lab services based on the local geographic area. The CLFS rates were established based on charge data obtained from laboratories in each geographic area, and reimbursement rates were equal to the lesser of (a) the amount billed by the lab service provider, (b) the local reimbursement rates included on the CLFS, or (c) a national limitation amount ("NLA"), which was equal to 74-percent of the median of all local fee

19

schedule amounts that were used in deriving the NLA for any lab test for which the NLA was established before January 1, 2001, and 100-percent of the median of all local fee schedule amounts for any lab test for which the NLA was established after January 1, 2001. *See* CMS, *Clinical Laboratory Fee Schedule: Payment System Series*, ICN 006818 (September 2017). Notably, CMS's published CLFS included the local reimbursement rate, national limit, and private third-party payer median payment amount for each laboratory test, identified by CPT code.

59. On June 23, 2016, the Secretary of HHS released its final rules governing the methodology by which Medicare would reimburse clinical lab testing service providers for lab tests beginning January 1, 2018. *See* 81 Fed. Reg. 41036. As described therein, the "Medicare payment amount for a test on the CLFS generally will be equal to the weighted median of the private payor rates determined for the test, based on the data that is collected during a data collection period and is reported to CMS during a data reporting period." *See Summary of Data Reporting for the Medicare Clinical Laboratory Fee Schedule (CLFS) Private Payor Rate-Based Payment Plan* (the "Medicare CLFS Update"), released by CMS on or around September 22, 2017. The data collection period ran from January 1, 2016, through June 30, 2016. The "data reporting period" ran from January 1, 2017, through March 31, 2017.

60. The Medicare CLFS Update stated that the CLFS rates would be based upon "applicable information" collected from "reporting entities." The "applicable information" included "(1) the Healthcare Common Procedure Code System (HCPCS) code for the test; (2) each private payer rate for the test described by that HCPCS code

Case 1:21-cv-00979-TDS-JLW   Document 1   Filed 12/29/21   Page 20 of 45

for which final payment has been made and (3) the associated volume of tests performed corresponding to each private payer rate."

61.     Notably, Labcorp has represented that it "believes that it generated more revenue from laboratory testing than any other [c]ompany in the world in 2017" 2017 10-K at 4, indicating that the CLFS rates are "most significantly affect[ed]" by the amounts entities such as Labcorp are actually paid for providing clinical lab testing services. *See* 81 Fed. Reg. 41,078 (June 23, 2016).

62.     Ultimately, for purposes of determining its 2018 CLFS reimbursement rates, CMS reported receipt of data from 1,942 "reporting entities in every state, the District of Columbia, and Puerto Rico," consisting of over 4.9 million records covering almost 248 million lab tests.

63.     According to data compiled by Medicare pursuant to PAMA, the "weighted median" price paid by third party payers for a Vitamin D test (CPT code 82306) to participating lab companies in the first half of 2016 was $26.37.  Labcorp sought to charge Nolan eleven times that amount ($292).

## G.     PLAINTIFFS' CLAIMS

### 1.     __Nathaniel J. Nolan__

64.     On September 6, 2018, Nolan's physician prescribed three lab tests for him: (i) a general health panel (CPT Code 80050), (ii) T4; free (CPT Code 84439); and (iii) Vitamin D, 25 hydroxy (CPT Code 82306).

65.     At the time, Nolan maintained health insurance through Highmark Blue Shield.

21

66. Because Labcorp was a "preferred provider" in network with Nolan's insurance, he visited a Labcorp facility in Reno, Nevada on September 11, 2018 to have these tests performed.

67. At Labcorp, Nolan presented his physician's test requisition to a Labcorp representative. Before Labcorp would draw Nolan's blood, its representative demanded that he sign a form acknowledging his estimated financial responsibility for the tests: $43.91. The document Nolan signed (entitled Patient Acknowledgment of Estimated Financial Responsibility, appended as Exhibit A), stated on page 1 in all capital letters and large print (in what appears to be 14-point font):

PATIENT ACKNOWLEDGEMENT OF
**ESTIMATED FINANCIAL RESPONSIBILITY**

The second line of the heading was bolded, as shown above. The document further stated, down the page to the left, again in all caps and bold print:

**SUMMARY OF ESTIMATED CHARGES**

68. The Patient Acknowledgement expressly listed the "Health Plan Allowed Rate" that Nolan's insurance was contracted with Labcorp to pay for the lab tests: General Health Panel ($17.82), T4; Free ($5.89), and Vitamin D, 25-hydroxy ($18.93). *See* Exhibit A. The Patient Acknowledgement also provided that Nolan would be obligated to pay the estimated charge of $1.27 for the blood draw (venipuncture). *Id*.

69. The Patient Acknowledgement further reflected that Nolan would be responsible for paying these negotiated rates directly to Labcorp because he had not yet

exhausted his deductible. The total of those costs ($43.91) was identified in bold, all caps on the first page of the document as "**YOUR OUT-OF-POCKET EXPENSES**."

70. The second page of the Patient Acknowledgement again displayed the heading in bolded, large print, and all caps: "**ACKNOWLEDGEMENT OF ESTIMATED FINANCIAL RESPONSIBILITY**."

71. The second page of the Patient Acknowledgement also specified in large print that "YOUR ESTIMATED RESPONSIBILITY" was $43.91 for "DEDUCTIBLE, COINSURANCE, AND COPAY." *Id*. Nolan understood that he was obligated to pay that amount for his lab tests.

72. Before taking Nolan's blood, Labcorp's representative confirmed, consistent with the written representations in the Patient Acknowledgement: "Don't worry about it, your estimated responsibility is less than $50."

73. Hidden in the legalese on the form, however, in small 7 or 8-point font, was a statement that "[t]his estimate assumes all services will be covered," and that if "your health plan" denies coverage for any test, the "amount" you "may have to pay may be different than the estimated amount":

> This estimate assumes all service will be covered. Your physician has requested the above service(s) and some services may be considered investigational, require prior authorization, are excluded or otherwise not covered by your health plan. Additionally, your physician may have requested laboratory services that will automatically trigger additional testing procedures based on certain clinical indications or your physician may determine it necessary to order additional testing procedures based on the sample collected today. Labcorp will bill you for any additional testing. Your health plan may not pay for these services and you will be personally responsible for these services....As outlined above, I understand that my health plan may not pay for this test(s) at 100%. The amount I may have to pay <u>may be different than the estimated amount.</u> I agree to be personally and fully responsible for charges from today's services that are not covered by my health plan. [Emphasis added.]

74. Nowhere on the form however is the patient advised of the patient list price or that the patient list price is many multiples of the disclosed negotiated rate.

75.    Two weeks later, Labcorp sent Nolan a bill for $316.98.  This bill was incomprehensible, and included charges that were multiples of those estimated in Labcorp's Patient Acknowledgment.

76.    More specifically, this September 25, 2018 Labcorp invoice described the blood tests and charged Nolan $316.98 for performing them.  The invoice did not identify the CPT code for the tests, or explain the basis for adjusting Labcorp's list prices from $649 to $316.98.  Based on the invoice, Nolan could not determine which tests were covered by his insurance, and for what amount.

77.    Nolan later received by hard copy an Explanation of Benefits ("EOB") from Highmark Blue Shield.  The EOB stated that Highmark covered (i) the general health panel, and that Labcorp's $191.00 rate had been discounted to $17.82 based on Highmark's agreement with Labcorp, (ii) the T4; Free test, and that Labcorp's $141.00 rate had been discounted to $5.89 based on Highmark's agreement with Labcorp, and (iii) the venipuncture, or blood draw, and that Labcorp's $25.00 rate had been discounted to $1.27 based on Highmark's agreement with Labcorp.  For the two tests and one procedure covered by insurance, Labcorp was willing to accept in complete satisfaction of its services $24.98, for which it had billed Highmark $357.00.  Labcorp was thus accepting approximately 7.0% of its billed rates for these services.

78.    However, Highmark denied coverage for Nolan's Vitamin D test. Highmark explained in a footnote to the EOB that "[w]e do not cover this service or item when provided for the diagnosis reported."  The EOB stated that Nolan would be responsible for paying the full, non-discounted price of $292 for the Vitamin D test.

24

79.     Nolan was shocked to be charged $292 by Labcorp for the Vitamin D test. Labcorp's Patient Acknowledgement – which Labcorp had required Nolan to sign – had represented that Labcorp was willing to perform the test for $18.93, yet the EOB reflected that Labcorp was charging him a rate 15.4 times that.

80.     Highmark is among the largest insurers in the United States; its parent company Highmark Health reported $18 billion in revenue and 5.6 million members in fiscal 2020.[8]  Vitamin D is among the most commonly-performed lab tests – and is among the tests most frequently denied by insurance.

81.     The Patient Acknowledgement that Nolan signed was intended to give him comfort that his potential liability for all the lab tests would not exceed $43.91, while enabling Labcorp through small print and legalese to bill him the exorbitant undisclosed sum of $292 for the Vitamin D test alone.

82.     Labcorp sent Nolan a second invoice dated January 21, 2019, stating again in large (this time bold) print "**$316.98 IS DUE IMMEDIATELY**."  The invoice continued:

> **Blue Cross Blue Shield – Anthem has processed your claim and has determined this amount is patient responsibility.  This bill is now past due.  Please remit prompt payment.**

83.     On January 28, 2019, Nolan paid $24.98 of the $316.98 Labcorp invoice, representing the deductible for the two tests and service covered by his health insurance.

---

[8] https://www.highmarkhealth.org/annualreport2020/financials/overview.shtml.

25

84. On February 18, 2019, Nolan received a threatening letter from LCA Collections (identified in the letter as an "in-house division" of Labcorp).

85. Labcorp, to avoid the restrictions of the Fair Debt Collections Practices Act ("FDCPA") had that letter sent by an "in-house division" rather than a third-party collections agency. The First LCA Collections Letter did not provide Nolan with the important procedural protections of a collection letter, including Nolan's right to notify the "debt collector in writing that [Nolan] … wishes the debt collector to cease further communications…." *See* 15 U.S.C. § 805(c).

86. The First LCA Collections Letter began in bold:

## **<u>Your Immediate Payment Required</u>**

The letter continued:

> Regretfully, unless this office receives payment in full, escalated recovery steps will be taken. Be advised, Labcorp reserves the right to report unpaid debt(s) to a credit bureau(s).

> This is a serious matter you should no longer ignore. You must act now to clear your delinquent credit status.

87. On February 25, 2019, Nolan paid $18.93 of the $292 remaining Labcorp invoice. This payment represented the estimate Labcorp gave Nolan on the September 11, 2018 Patient Acknowledgement for the cost of the Vitamin D test.

88. On February 26, 2019, Nolan wrote Adam Schechter, Labcorp's CEO, pleading with Schechter "that some degree of decency and fairness prevail, and that you at a minimum reduce my bill by 50%:"

89. Nolan's letter stated in full:

26

On 9/11/18 I went to LabCorp in Reno, NV with an order for 4 tests. I was given an estimated financial responsibility of $43.91. There was no information on any of the paperwork that indicated how much my insurance company would be charged, only my estimated responsibility.

BCBS denied one of the tests, Vit D, for which my responsibility had been estimated at $18.93. I then received a bill from your company for $316.98, of which $292 was for the Vit D test. I paid the $43.91, then emailed LabCorp through its website, but received no response. THE AVERAGE COST OF A VITAMIN D LAB TEST IN OUR COUNTRY IS $50. There is no indication on my original paperwork that I would owe nearly $300 for one test; if there had been, I absolutely would not have consented to the test. I went to LabCorp because your company is a "preferred provider" on my insurance company's plan, but you are not my only choice for a laboratory. Cash prices for Vit D tests in Reno are approximately $50 if a patient does not use insurance. What if you decided to charge $900 for the test, or $5,000? What is the limit? $292 is not a usual and customary price for a Vit D test. This is not simply a matter of an insurance company denying coverage - it is a matter of your company taking advantage of unsuspecting consumers by charging a rate 6 TIMES the national average, a rate nearly 16 TIMES the amount you will accept from an insurance company. Had I been aware that I would be charged $292 for a test I could pay $50 for elsewhere, I certainly would not have consented to it. At the very least I would have gone to a different lab.

I recently called the customer service number on your threatening bills and asked if 50% could be accepted as payment in full, but was told that 20% is the most that the bill could be reduced by.

I am again asking that some degree of decency and fairness prevail, and that you at a minimum reduce my bill by 50%. This amount would still be 8 times the figure I should be paying.

90.     Nolan's letter to Schachter was ignored.  Nolan never received a response.

91.     On April 25, 2019, LCA Collections, the "in-house division" of Labcorp, sent Nolan a second threatening letter.

92.     The Second LCA Collections Letter threatened Nolan, and was titled in large font and all capital letters:

# FINAL NOTICE
# PROTECT YOUR CREDIT

The letter continued:

> Unless Labcorp receives full payment within 20 days, your account will be referred to an outside collections agency. We will authorize the agency to report any delinquent balance to the credit bureaus.

> ... You have had ample time to pay this bill or to file and recover from your insurance company. YOUR PAYMENT IS DUE NOW.

> PROTECT YOUR CREDIT HISTORY AND ACT IMMEDIATELY.

93.     Labcorp in fact referred Nolan's account to an outside collections agency. On November 19, 2019, Credit Collections Services sent Nolan an invoice for $273.07.

94.     On December 10, 2019, Credit Collections Services sent Nolan a second letter. Although the Second Credit Collections Services Letter offered a "Discount Opportunity," the amount of the invoice was $273.07, as was the earlier one.

95.     The Labcorp invoice has subsequently transferred to a second outside collection agency, Radius Global Solutions, and reported to at least one credit bureau, Experian.

## 2. **Helena Wittenberg**

96.     Wittenberg has health insurance through her husband Wayne Wittenberg's employer's (Veritas Technologies LLC) insurance plan.

97.     In January 2018, Wittenberg's doctor's office (Sunstate Medical), at a scheduled medical visit, prescribed three lab tests: (i) a lipid panel (CPT Code 80061),

(ii) a general health panel (CPT Code 80050), and (iii) a HGB [hemoglobin A1c]; glycated test (CPT Code 83036).

98.     In January 2018, another of Wittenberg's medical practices (Regency Endocrinology Diabetes & Metabolism), also at a scheduled medical visit, prescribed five lab tests: (i) a general health panel (CPT Code 80050), (ii) a lipid panel (CPT Code 80061), (iii) a T4 [thyroid]; free test (CPT Code 84439), (iv) a T3 [thyroid]; free test (CPT Code 84481); and (v) a HGB; glycated test (CPT Code 83036).

99.     In both instances, the lab tests were to be performed prior to Wittenberg's next scheduled medical visit.

100.    On April 16, 2018, Wittenberg went to the LabCorp service center in Lake Mary, Florida, to have her blood tests performed.  Wittenberg provided her physicians' test requisitions to a Labcorp representative.

101.    At the Labcorp PSC, Wittenberg signed two separate forms acknowledging that her estimated financial responsibility for the lab tests was limited to $44.60 and $65.27, respectively.  The documents Wittenberg signed (appended as Exhibits B and C), stated on page 1 in all capital letters and large print (in what appears to be 14-point font):

PATIENT ACKNOWLEDGEMENT OF
**ESTIMATED FINANCIAL RESPONSIBILITY**

102.    The second line of the heading was bolded, as shown above.

103.    The "Patient Acknowledgements" contained a separate heading stating "INSURANCE COVERAGE INFORMATION."  The Patient Acknowledgements further stated that her insurance status was "eligible" as of April 16, 2018.

104.    The document, further down the page to the left, again in all caps and bold print, stated:

**SUMMARY OF ESTIMATED CHARGES**

105.    Immediately below that caption appears in Arial, 6-point font that "This estimate assumes all services will be covered."

106.    The Patient Acknowledgements listed the "Health Plan Allowed Rate." The first Patient Acknowledgement (Exhibit B) stated: Lipid Panel ($7.88), General Health Panel ($28.92), and HGB; Glycated [Hemoglobin A1c] ($7.80).

107.    The second Patient Acknowledgement (Exhibit C) stated: General Health Panel ($28.92), Lipid Panel ($7.88), T4; Free ($6.16), T3; Free ($11.56), and HGB; Glycated [Hemoglobin A1c] ($7.80). The second Patient Acknowledgement also stated that Wittenberg would be obligated to pay the estimated charge of $2.95 for the blood draw (venipuncture).

108.    The Patient Acknowledgements contained no information on what Wittenberg would be charged if her insurance did not cover the lab tests.

109.    The totals of those costs ($44.60 and $65.27, respectively) were identified on the first page of both documents as "YOUR OUT-OF-POCKET EXPENSES."

110.    The second page of both documents again stated in bolded, large print, and all caps:

PATIENT ACKNOWLEDGEMENT OF
**ESTIMATED FINANCIAL RESPONSIBILITY**

and stated directly under that, in all caps:  ACKNOWLEDGEMENT OF

ESTIMATED FINANCIAL RESPONSIBILITY.

111.    The second page also identified on the two documents that "YOUR

ESTIMATED RESPONSIBILITY" was $44.60 and $65.27, respectively, for

DEDUCTIBLE, COINSURANCE, AND COPAY.  Wittenberg understood that she was

obligated to pay those amounts toward her insurance.

112.    Printed on the form, however, in Arial 6-point font, was a statement that

"[t]his estimate assumes all services will be covered," and that if "your health plan"

denies coverage for any test, the "amount" you "may have to pay may be different than

the estimated amount":

> This estimate assumes all service will be covered.  Your physician has requested the above service(s) and some services may be considered investigational, require prior authorization, are excluded or otherwise not covered by your health plan.  Additionally, your physician may have requested laboratory services that will automatically trigger additional testing procedures based on certain clinical indications or your physician may determine it necessary to order additional testing procedures based on the sample collected today.  LabCorp will bill you for any additional testing.  Your health plan may not pay for these services and you will be personally responsible for these services....*As outlined above, I understand that my health plan may not pay for this test(s) at 100%.  The amount I may have to pay may be different than the estimated amount.  I agree to be personally and fully responsible for charges from today's services that are not covered by my health plan.*  [Emphasis added.]

113.    Wittenberg had not noticed that fine print at the patient service center.

114.    Nowhere on the form was Wittenberg advised of the amount she would be

charged if insurance denied coverage.  The form states only that the price charged if

insurance denies coverage "may be different" than the stated estimated amount.

115.    No other prices were disclosed on the form.

116.    Subsequently, Wittenberg received by hard copy in the mail an Explanation

of Benefits ("EOB") from her insurer.  The EOB provided the designation "AN4" with

respect to the lab tests at issue, stating that Labcorp was "out of network" with her

insurance and that she "may be held responsible for any charges in excess of the maximum allowed amount."

117. Thereafter, Wittenberg received an invoice dated June 16, 2018 from LabCorp billing her on the first requisition from Sunstate Medical: (i) $171 for the general health panel, versus the $28.92 estimate, (ii) $66 for the HGB; glycated [Hemoglobin A1c] test, versus the $7.80 estimate, and (iii) $98 for the lipid panel, versus the $7.88 estimate. All total, Labcorp billed Wittenberg $335 for the three tests compared to the $44.60 estimate.

118. The following reflects the contrast between the Health Plan Allowed Rate Wittenberg had been provided in the Patient Acknowledgement and the Patient List Price Wittenberg was billed on June 16, 2018 on the second invoice:

| Test | Health Plan Allowed Rate | Patient List Price |
|------|--------------------------|--------------------|
| CBC | | $31.00 |
| Comp. Meta. Panel | | $46.00 |
| TSH | | $94.00 |
| Gen. Health Panel | **$28.92** | **$171.00** |
| Lipid Panel | $7.88 | $98.00 |
| Hemoglobin | $7.80 | $66.00 |
| Total | **$44.60** | **$335.00** |

119.    Wittenberg also received a second invoice dated June 16,2018 from Labcorp billing her $650, and identifying the charges as: (i) $384 for the TSH +T4F+T3 Free tests, $31 for the complete blood count, and $46 for the comprehensive metabolic panel, versus the $46.64 estimate for the aggregate of the general health panel ($28.92), T4; Free ($6.16) and T3; Free ($11.56)  tests, (ii) $98 for the lipid panel, versus the $7.88 estimate, (iii) $66.00 for the HGB; Glycated [Hemoglobin A1c], versus the $7.80 estimate, and (vi) $25 for the blood draw, versus the $2.95 estimate.  Labcorp had stated that her responsibility for those tests was $65.27.

120.    The following reflects the contrast between the Health Plan Allowed Rate Wittenberg had been provided in the Patient Acknowledgement and the Patient List Price she was billed on June 16, 2018 on the second invoice:

| Test | Health Plan Allowed Rate | Patient List Price |
|---|---|---|
| General Health Plan | $28.92 | |
| T4; Free | $ 6.16 | |
| T3; Free | $11.56 | |
| TSH+T4F+T3 Free | | $384.00 |
| CBC | | $ 31.00 |
| Comp. Meta. Panel | | $ 46.00 |
| Total | **$46.64** | **$461.00** |
| Venipuncture | $ 2.95 | $ 25.00 |
| Lipid Panel | $7.88 | $ 98.00 |
| HGB; Glycated | $ 7.80 | $ 66.00 |
| Total | **$65.27** | **$650.00** |

121.    Labcorp offset from the invoices the $44.60 and $65.27 credit card charges that Wittenberg had authorized, so that the net amounts of those invoices were $290.40 and $584.73, respectively,

122.    Wittenberg was shocked that Labcorp charged her $985 ($335 plus $650) for the eight tests and one blood draw, compared to the $109.87 estimate ($44.60 plus $65.27).

123.    In August 2018, Wittenberg received a letter from LCA Collections (identified as an "In-House Division" of Labcorp), dated August 11, 2018, demanding payment of $584.73, stating in large letters "Immediate Payment Required." The letter stated "[y]our account is … seriously past due," that "[f]ailure to pay the past due amount will result in referral to a Third Party Collection Agency and potentially affect your credit

score," and that "LabCorp reserves the right to refuse laboratory services for failure to pay past due balances."

124.    That notice was followed up with a second notice from LCA Collections dated September 1, 2018, again demanding payment of $584.73 and stating that the bill was "seriously past due.  It is not our wish to have this matter handled as a collection issue.  However, if this bill is not satisfied immediately, it will be listed as a severely delinquent account and further collection activities will proceed."

125.    A further, similar letter was sent by LCA Collections on September 22, 2018.

126.    Also in August and September 2018, Wittenberg received notices from Labcorp dated August 11, 2018, September 1, 17, and 22, 2018, demanding payment of $290.40 on the other invoice.  Those notices also stated in large bold print, among other things:  "Your insurance company has processed your claim.  Balance due is your responsibility.  Protect your credit now."

127.    On August 28, 2018, Wittenberg's husband began a series of emails with Labcorp concerning the invoices.  As part of that email stream on September 14, 2018, Wittenberg's husband wrote LabCorp stating that "[t]he fact that my wife was out of network should have been known by your staff and your computer system…. If my wife had been given an estimated financial responsibility that matches your current bill, she would have known something was wrong and she would [have] walked out the door.  The prices being billed now are simply out of our budget.  And a high estimated cost would have exposed that she was out of network and things could have been resolved before

35

services were rendered.… [I]t is predatory to expect these large payments after your company failed to warn us during either visit that we were out of network and that the costs would be extremely high."

128. Labcorp responded by email dated September 22, 2018 stating that "[t]he estimated financial responsibility is just an estimate assuming all services will be covered.… Please review the attached EFR [Estimated Financial Responsibility] as it advises patients cost may be more. Because at any given time Labcorp can be contracted with hundreds of insurance companies … there is no way for our billing agents to maintain that information." The Labcorp email did not address the fact that Labcorp knows its Patient List Prices and that those prices are approximately nine times higher than its negotiated rates and that Labcorp failed to advise Wittenberg in advance of those Patient List Prices, while advising her in the Patient Acknowledgment form only that the Patient List Prices "may differ" from the disclosed negotiated rates.

129. The two Notices subsequently received from LCA Collections dated September 22, 2018 threatened that Wittenberg's account was "severely delinquent" and that a "lack of response will only result in outside collection activities."

130. Out of concern for her credit rating and to stop the onslaught of threatening letters from Labcorp and LCA Collections, Wittenberg began paying $10 a month towards her bill.

131. As of October 24, 2019, Wittenberg paid $10 per month, totaling $140 towards each invoice.

36

132.    Among the reasons that Wittenberg determined to stop paying in October 2019 is that she learned about the *Anderson* lawsuit and recognized that her experience with Labcorp is part of a pattern of Labcorp deceiving and overbilling patients.

133.    In or about April 2020, Wittenberg received a copy of a letter dated March 31, 2020 from Radius Global Solutions LLC ("Radius"), a debt collection company. That letter demanded payment of a purported $444.73 debt ($650-$65.27-$140).

134.    Shortly after receiving that notice, Wittenberg received a second letter from Radius demanding payment of a purported $150.40 debt ($335-$44.60-$140).

135.    In November 2020 Wittenberg received a subsequent notice from Radius offering to resolve her purported $444.73 debt for $266.84 (what appears to be 60% of $444.73).

136.    In April and May, 2018, Wittenberg received a series of letters from Credit Collection Services, a debt collector company, advising that unless she paid the amounts of $444.73 and $150.40 promptly, that her purported debts would be reported to a credit rating agency.

137.    As a result of the events described above, a purported unpaid debt of $444.73 from Wittenberg to Labcorp has been reported to credit rating agencies.

## H.    LABCORP SENDS OUT THREATENING LETTERS DEMANDING PAYMENT

138.    Labcorp sends out invoices and letters to patients threatening harm to their credit ratings and being barred from receiving future Labcorp services. These threats are particularly troubling to those patients whose physicians or insurers require exclusive use of Labcorp's services.

37

139. Labcorp, to avoid the restrictions of the FDCPA, created an "in-house division" to act as a collection agency – "LCA Collections."[9] LCA Collections sends letters that do not provide patients with the important procedural protections of a collection letter, including notifying the "debt collector in writing that the consumer ... wishes the debt collector to cease further communications ...." *See* 15 U.S.C. § 805(c).

140. The LCA Collections letters harass patients. For example, notices received by members of the Plaintiff Class were titled in large font and all capital letters: **FINAL NOTICE PROTECT YOUR CREDIT** and **IMMEDIATE PAYMENT REQUIRED.** The LCA letters threatened to ruin patients' credit and foreclose them from Labcorp's services if they did not pay Labcorp's excessive bills.

141. As noted above with respect to Nolan, Labcorp also transfers accounts to outside collection agencies to mail similar harassing letters. These letters also threaten to ruin credit ratings and foreclose customers from medical services unless they pay their excessive bills.

## CLASS ALLEGATIONS

142. Plaintiffs Nolan and Wittenberg bring this action on behalf of a class of all persons residing in the State of Nevada or Florida who signed a Patient Acknowledgement form disclosing the "Estimated Charges" for lab services, but were

---

[9] The FDCPA does not apply to internal efforts to collect debts, only to efforts of third-party collection agencies.

38

billed a patient list price for those services that exceeded the disclosed "Health Plan Allowed Rate" for those services.

143. This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3). The Class satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

144. **Numerosity**. The members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members can be determined only by appropriate discovery, Plaintiff believes that there are thousands of Class members residing in Nevada and Florida. Labcorp claims to engage in more than 160 million patient encounters each year, and typically processes more than 3.0 million patient specimens per week.

145. Because of the geographic dispersion of Class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

146. **Commonality**. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    a. Whether the Patient Acknowledgment form is deceptive;

    b. Whether the Patient Acknowledgment form violates the Nevada Deceptive Trade Practices Act;

c.   Whether the Patient Acknowledgment form violates the Florida Deceptive and Unfair Trade Practices Act;

d.   Whether Plaintiffs and Class Members are entitled to monetary damages or amounts paid in excess of the "Health Plan Allowed Rates"; and

e.   Whether Plaintiff and the Class are entitled to injunctive or other equitable relief to remedy Labcorp's continuing violations of law as alleged herein.

147.   **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs have no interests that are adverse or antagonistic to those of the Class.  Plaintiffs' interests are to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

148.   **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex and consumer class action litigation.

149.   **Superiority**.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by the members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged.

150.   In addition, as alleged herein, Labcorp has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

151.    The Class is readily definable, and prosecution of this Action as a class action will reduce the possibility of repetitious litigation.

152.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I

**Violations of the Nevada Deceptive Trade Practices Act,
Nev. Rev. Stat. §§598.0903, *et seq.*
(On behalf of Plaintiff Nolan and the Nevada Class)**

153.    Plaintiff Nolan repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

154.    The Nevada Deceptive Trade Practices Act ("NDTPA") prohibits deceptive trade practices, which include "[m]ak[ing] false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions" and "[k]nowingly makes any other false representation in a transaction."   Nev. Rev. Stat. §598.0915.

155.    As alleged herein and above, Labcorp has engaged in an unfair or deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers. These acts and practices violate the NDTPA.

156.    Among other things, the Patient Acknowledgement form is materially misleading in that it discloses only the negotiated rates with insurers.  Although the form states in small print that the insured rate may not apply if an insurer denies coverage, the

41

form states only that the charged rate "may be different than" the insured rate. Labcorp fails to disclose to patients the patient list price that patients would be *required* to pay if insurance denies coverage, and fails to disclose that the patient list price is many multiples of the insured rate.

157. Nolan and the other members of the Nevada Class have been and continue to be injured as a direct and proximate result of Labcorp's violations of the NDTPA.

158. Nolan and the other members of the Nevada Class either (i) refused to pay Labcorp's bill because of its excessive rates, (ii) paid Labcorp's bill under duress, or (iii) paid Labcorp's bill in reliance on a presumption that Labcorp had billed them the commercially reasonable fair market value. No person would have knowingly paid an excessive rate.

159. Nolan is entitled to pursue a claim on behalf of the Nevada Class against Labcorp under Nev. Rev. Stat. §41.600 for damages, equitable and declaratory relief, and attorneys' fees and costs to remedy Labcorp's violations of the NDTPA.

## COUNT II

**Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. Ann. §§501.201, *et seq.***
**(On behalf of Plaintiff Wittenberg and the Florida Class)**

160. Plaintiff Helena Wittenberg herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

161. LabCorp's lab services constitute "trade or commerce" as defined in Fla. Stat. Ann. §501.203(8).

42

162.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair

or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. Ann.

§501.204(1).

163.    As alleged herein and above, LabCorp has engaged in unfair methods of

competition, unconscionable acts or practices, and unfair or deceptive acts or practices in

connection with its improper billing and debt collection for laboratory testing and other

services, including the practice of misrepresenting facts in the Patient Acknowledgement

that Labcorp's PLPs that Labcorp will bill patients if insurance does not cover their tests

"may be different that the estimated amount" on the Patient Acknowledgement form,

when Labcorp has actual knowledge that the PLP is many multiples (frequently more

than ten times) the estimated amount on the Patient Acknowledgement form.

164.    Wittenberg and the other Florida Class members have been and continue to

be injured as a direct and proximate result of LabCorp's violations of the DUTPA.

165.    Wittenberg and the other Florida Class members either (i) paid LabCorp's

bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii)

paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the

commercially reasonable fair market value.

166.    Wittenberg is entitled to pursue a claim on behalf of the Class against

LabCorp pursuant to Fla. Stat. Ann. §§501.2105 and 501.211 for damages, equitable

relief, and attorney's fees and costs to remedy LabCorp's violations of the FDUTPA.

43

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Labcorp as follows:

A.      Certifying the Class pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class; and

B.      Awarding Plaintiffs, and the Class, damages under the NDTPA and the FDUTPA;

C.      Awarding Plaintiffs, and the Class, statutory and exemplary damages where permitted;

D.      Permanently enjoining Labcorp from continuing to engage in the unlawful and inequitable conduct alleged herein;

E.      Granting Plaintiffs, and the Class, the costs of prosecuting this action and reasonable attorneys' fees; and

F.      Granting such other relief as this Court may deem just and proper under the circumstances.

Case 1:21-cv-00979-TDS-JLW   Document 1   Filed 12/29/21   Page 44 of 45

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated:  December 29, 2021

ELLIS & WINTERS LLP

By:  _/s/_ Jonathan D. Sasser
     Jonathan D. Sasser
     N.C. State Bar No. 10028
     P.O. Box 33550
     Raleigh, North Carolina 27636
     Telephone Number: (919) 865-7000
     Facsimile Number: (919) 865-7010
     jon.sasser@elliswinters.com

     _Counsel for Plaintiffs_

OF COUNSEL:

Robert C. Finkel
David Nicholas
Matthew Insley-Pruitt
Timothy D. Brennan
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone Number: (212) 759-4600
Facsimile Number: (212) 486-2093
rfinkel@wolfpopper.com

_Counsel for Plaintiffs_

45