IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NATHANIEL J. NOLAN and HELENA      )
WITTENBERG, individually and       )
on behalf of all others            )
similarly situated,                )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )        1:21cv979
                                   )
LABORATORY CORPORATION OF          )
AMERICA HOLDINGS,                  )
                                   )
                Defendant.         )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This is a putative class action involving claims of unfair
and deceptive conduct under Nevada and Florida law related to the
billing practices of Defendant Laboratory Corporation of America
Holdings ("Labcorp," sometimes referred to the parties as
"LabCorp").[1] Before the court is Labcorp's motion to dismiss all
claims pursuant to Federal Rule of Civil Procedure 12(b)(6).
(Docs. 10, 11.) Plaintiffs filed a response in opposition (Doc.
13), and Defendant replied (Doc. 15). On November 8, 2022, the
court heard oral argument. For the reasons set forth below, the
motion to dismiss for failure to state a claim will be granted,

---

[1] Plaintiffs allege this case is related to a separate putative class
action against Labcorp, Anderson v. Laboratory Corp. of Am. Holdings,
No. 1:17-cv-193 (M.D.N.C.).

1

and the complaint will be dismissed.

I.  **BACKGROUND**

The allegations of the complaint, viewed in the light most favorable to Plaintiffs as the non-moving parties, show the following:

LabCorp provides laboratory testing services to millions of healthcare recipients internationally. (Doc. 1 ¶ 27.) It has more than 100 million patient encounters annually and "typically processes clinical lab tests on more than 3 million patient specimens per week." (Id. ¶ 12.) "Labcorp Diagnostics," one of Labcorp's two major business segments, is an independent clinical laboratory business that provides the services that are the subject of Plaintiffs' complaint. (Id. ¶ 28-29.) Labcorp Diagnostics offers an array of frequently requested and specialty testing through a network of primary and specialty laboratories. (Id.) Its customers are managed care organizations, biopharmaceutical companies, governmental agencies, physicians and other healthcare providers, hospitals, employers, patients, and consumers. (Id. ¶ 31.)

Labcorp routinely performs lab testing services prior to processing billing information and determining the ultimate amount due. (Id. ¶¶ 21, 48.) It later determines the price and the paying party's information upon receiving (i) a medical diagnosis code and test code for each lab test prescribed by a physician,

2

and (ii) the patient's insurance information (for insured patients). (Id.) If the service is covered by a patient's health insurance plan, Labcorp bills the third-party payer the "health plan allowed" rate.[2] (Id. ¶¶ 21-22, 48, 55.) If the service is not covered by the patient's health insurance plan, Labcorp bills the patient directly at the "patient list price" (hereinafter "list price"). (Id. ¶¶ 21-22.) These rates vary greatly, but the list price tends to be much higher than the health plan allowed rate. (Id.) Accordingly, if a patient's insurer denies coverage for certain lab testing services, the patient will generally owe Labcorp the much higher list price. (Id. ¶¶ 4-5, 9-10.)

Typically, a patient will authorize his or her physician to order lab testing without inquiring as to what lab will perform the work. In this situation, the patient's healthcare provider will generally collect the specimen necessary for testing, e.g., perform a blood-draw, and then send that specimen to a Labcorp location for testing. (Id. ¶ 21.) In some instances, however, a patient will go directly to a Labcorp "patient service center" or other Labcorp facility to have the lab-testing services performed.

---

[2] Even though Labcorp bills the third-party payer, e.g., the patient's insurer, the patient is usually responsible for paying all or part of the health plan allowed rate directly to Labcorp because the cost of the lab testing services frequently does not exhaust the patient's health insurance deductible. (Doc. 1 ¶ 69.) Thus, the health plan allowed rate generally corresponds to what the patient owes out-of-pocket (at least when the pertinent lab testing services are covered by the patient's health insurance plan). (Id. ¶¶ 21-22, 48, 69.)

3

(Id. ¶¶ 29, 66, 100-101.)  Before it will perform any lab testing services, however, Labcorp asks its patients to review and sign a document - the Patient Acknowledgement of Estimated Financial Responsibility form (the "Patient Acknowledgement") (Id. ¶¶ 1, 3-4, 7; Doc. 1-1; Doc. 1-2; Doc. 1-3.)

The Patient Acknowledgment - which forms the basis of Plaintiffs' complaint - is a "common form used throughout Labcorp's operations and is signed by thousands, if not millions" of patients a year.  (Id. ¶ 12.)  It provides insured patients with an estimate of the total amount due for the lab-testing services, <u>assuming those services are covered by their health insurance plan</u>.  Put differently, the Patient Acknowledgment gives patients an estimate of what they will owe out-of-pocket, reflecting the estimated deductible, coinsurance, and copay amounts if the lab-testing services provided are covered by their health insurance plan.  (Id. ¶¶ 1, 3, 73, 112; Doc. 1-1, Doc. 1-2, Doc. 1-3.)  The Patient Acknowledgment refers to this cost estimate as the "health plan allowed rate."  (Id.)  It also sets out the "Estimated Amount Paid by Health Plan."  (Id.)  The form has a block on page two entitled, "YOUR ESTIMATED RESPONSIBILITY" with a dollar amount provided. (Id.)  What the Patient Acknowledgement does not provide is the (generally more expensive) list price - the amount a patient would owe in the event the services are <u>not</u> covered by her health insurance.  (Id. ¶ 74; Doc 1-1, Doc. 1-2, Doc. 1-3.)

4

The second page of the Patient Acknowledgment includes further information about the estimate's conditional nature. In full, it reads:

> You are being provided with this Acknowledgment of Estimated Financial Responsibility. **This estimate assumes all services will be covered.** Your physician has requested the above service(s) and some services may be considered investigational, require prior authorization, are excluded or otherwise not covered by your health plan. Additionally, your physician may have requested laboratory services that will automatically trigger additional testing procedures based on certain clinical indications or your physcian may determine it necessary to order additional testing procedures based on the sample collected today. LabCorp will bill you for any additional testing. Your health plan may not pay for these services and you will be personally responsible for payment for these services. **This acknowledgment is based on the health plan information provided at the time of service.** In the event that your information changes, your acknowledgment of financial responsibility still applies.
>
> *By signing below, you acknowledge: I want the laboratory test(s) listed above to be performed. My health plan will be billed for the applicable charges. As outlined above, I understand that my health plan may not pay for this test(s) at 100%. **The amount I may have to pay may be different than the estimated amount. I agree to be personally and fully responsible for charges from today's services that are not covered by my health plan.***

(Doc. 1-1 at 2 (bold added); Doc. 1-2 at 2 (bold added); Doc. 1-3 at 2 (bold added).)   Thus, by signing the Patient Acknowledgment, the patient agrees that her "health plan may not pay for this test(s) at 100%" and that the amount the patient "may have to pay may be different than the estimated amount."

Plaintiffs Nathaniel Nolan and Helena Wittenberg complain

5

that that the Patient Acknowledgement is materially misleading and deceptive under their respective state's law because it discloses the health plan allowed rate without also disclosing the patient's list price – the amount due in the event the test is not covered by insurance.

### A. Plaintiff Nolan

On September 11, 2018, Plaintiff Nolan visited a Labcorp facility in Reno, Nevada, to have several lab tests performed. (Doc. 1 ¶¶ 64-66.) Before Labcorp would administer the tests, however, a Labcorp representative required Nolan to sign the Patient Acknowledgment, which included an estimate of the health plan allowed rate that Nolan would owe assuming each test was covered by his insurance. (Id. ¶ 67; Doc. 1-1 at 1.) Nolan signed and dated the Patient Acknowledgment, thereby agreeing "to be personally and fully responsible for charges" for those lab-testing services not covered by his health plan. (Doc. 1 ¶ 73, Doc. 1-1 at 2.) One of the tests was a Vitamin D, 25-hydroxy test, which the health plan allowed rate estimated would cost him $18.93. (Doc. 1 ¶ 4, 68; Doc. 1-1 at 1.) The Patient Acknowledgement did not include the list price of the Vitamin D (or any other) test, "or that the list price is many multiples of the disclosed negotiated rate." (Doc. 1 ¶ 74.)

Two weeks later, Labcorp sent Nolan a bill, which charged him $292 for the Vitamin D test. (Id. ¶¶ 5, 75-79.) Unable to

6

understand the discrepancy between the bill ($292) and the Patient Acknowledgement ($18.93), Nolan requested and received an Explanation of Benefits ("EOB") from Highmark Blue Shield, his insurer. (Id. ¶ 77.) Highmark explained that although Nolan's insurance plan covered each of the other tests, it did not cover the Vitamin D test. (Id. ¶ 78.) Accordingly, the EOB stated that Nolan would be responsible for paying Labcorp the Vitamin D list price of $292 (in addition to the health plan allowed rate for each of the other tests Nolan was administered, because Nolan had not met his copay or deductible). (Id.) Nolan was "shocked" because he assumed, based on the Patient Acknowledgment, that Labcorp was willing to perform the test for the "Health Plan Allowed Rate" of $18.93. (Id. ¶ 79.) Nolan has since refused to pay the list price for the test "absent an appropriate settlement of his claim." (Id. ¶ 5.)

### B. Plaintiff Wittenberg

Plaintiff Wittenberg's experience is similar. On April 16, 2018, Wittenberg went to a Labcorp patient service center in Lake Mary, Florida, where she was administered two different sets of clinical laboratory tests. (Id. ¶¶ 7-8, 100.) Wittenberg signed a Patient Acknowledgement for each set of tests. (Doc. 1 ¶¶ 7, 101, 106, 109; Doc. 1-2 at 2; Doc. 1-3 at 2.) The total estimated responsibility, based on the "Health Plan Allowed Rate" for the first set of tests provided a cost estimate of $44.60 (Doc. 1 ¶¶ 7,

7

101, 106; Doc. 1-2 at 1) and $65.27 for the second set (id. ¶¶ 9, 101, 109, Doc. 1-3 at 1); the totals for both estimates reflected that the full expense was within the applicable deductible.

Subsequently, Wittenberg received an EOB from her insurer. (Doc. 1 ¶ 116.) It stated that because Labcorp was out of network with her insurance plan, she might be held responsible for "any charges in excess of the maximum amount." (Id.) Shortly thereafter, Wittenberg received two invoices from Labcorp, each corresponding to the set of lab tests she received in April. (Id. ¶¶ 117, 119.) The invoices revealed that, because her insurance was out of network with Labcorp, none of the tests she received was covered; as a result, Labcorp charged her the list price rather than the health plan allowed rate for each test. (Id. ¶¶ 9, 116-122.) The first invoice showed that Wittenberg owed Labcorp a total of $335 for the first set of tests, as opposed to the $44.60 estimate disclosed on the Patient Acknowledgment. (Id. ¶¶ 8-9, 117-18.) The second invoice showed that she owed a total of $650 for the second set of tests, as opposed to the $65.27 Patient Acknowledgement estimate. (Id. ¶¶ 8-9, 119-120.) Wittenberg has since paid Labcorp only the health plan allowed rate stated on the Patient Acknowledgment, plus "$140 towards the [outstanding] cost of each bill." (Id. ¶ 10.) She has otherwise refused to pay the patient list prices "absent an appropriate settlement of her claim." (Id.)

8

On December 29, 2021, Plaintiffs Nolan and Wittenberg filed the present putative class action. In Count I, Nolan alleges that Labcorp has engaged in unfair or deceptive trade practices by improperly billing for lab testing services in violation of the Nevada Deceptive Trade Practices Act ("NDTPA"), Nev. Rev. Stat. § 598.0903 et seq. (Id. ¶¶ 153-59.) In Count II, Wittenberg alleges that Labcorp has engaged in "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices" in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201, et seq. (Id. ¶¶ 160-66.) Nolan, a resident of Nevada, and Wittenberg, a resident of Florida, seek to certify a class of all persons residing in each state who signed a Patient Acknowledgment disclosing the "Estimated Charges" for lab services but were billed a patient list price that exceeded the disclosed health plan allowed rate for those services. (Id. ¶¶ 142, 153-59, 160-66.)

Labcorp now moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), largely on the basis that there "is nothing misleading, false, deceptive, or unfair" about the Patient Acknowledgment because, by its explicit terms, it merely provides an estimate "assuming that all services will be covered by the patient's health plan." (Doc. 11 at 1-2.) Plaintiffs argue in response that Labcorp's use of the Patient Acknowledgment is deceptive because Labcorp knows that its patients might owe higher

9

list prices but "makes a conscious decision not to disclose them."
(Doc. 13 at 10).

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

A motion to dismiss under Rule 12(b)(6) is meant only to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Thus, in considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor. Ibarra v. United States,

120 F.3d 472, 474 (4th Cir. 1997).

"Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegation 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Sauers v. Winston-Salem/Forsyth Cty. Bd. Of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016) (alterations in original) (quoting Twombly, 550 U.S. at 555). "[T]he complaint must 'state[] a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010) (alterations in original) (quoting Iqbal, 556 U.S. at 679). As such, mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In ruling on a Rule 12(b)(6) motion, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). The court may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Generally, a "court cannot go beyond these

11

documents" without "convert[ing] the motion into one for summary judgment," an action from which courts should refrain "where the parties have not had an opportunity for reasonable discovery." E.I. du Pont, 637 F.3d at 448.

**B.  Nevada Deceptive Trade Practices Act Claim**

In Count I of the complaint, Plaintiff Nolan alleges that Labcorp has violated the NDTPA. (Doc. 1. ¶¶ 153-59.)  The NDTPA authorizes an action "by any person who is a victim of consumer fraud." Nev. Rev. Stat. § 41.600(1). To state a claim, a plaintiff must establish: (1) "an act of consumer fraud by the defendant," (2) causation, and (3) damages.  Bertsch v. Discover Financial Services, No. 2:18-cv-00290-GMN, 2020 WL 1170212, at *5 (D. Nev. Mar. 11, 2020); Switch, Ltd. v. Uptime Inst., LLC, 426 F. Supp. 3d 636, 643 (D. Nev. 2019); Picus v. Wal-Mart Stores, Inc., 256 F.R.D. 651, 657-58 (D. Nev. 2009) (noting Nevada Supreme Court has not specified the elements of a NDTPA claim and predicting how the court would rule).  As used in § 41.600, actionable "consumer fraud" includes any "deceptive trade practice as defined in NRS 598.0915 to NRS 598.0925, inclusive."  Nev. Rev. Stat. § 41.600(2)(e); see Bertsch, 2020 WL 1170212, at *5 (D. Nev. Mar. 11, 2020).

Section 598 defines a deceptive trade practice to include: (1) "mak[ing] false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons

12

for, existence of or amounts of price reductions" pursuant to Nev. Rev. Stat. § 598.0915(13); (2) "knowingly mak[ing] any other false representation in a transaction" pursuant to Nev. Rev. Stat. § 598.0915(15); and (3) "knowingly . . . fail[ing] to disclose a material fact in connection with the sale or lease of goods or services" pursuant to Nev. Rev. Stat. § 598.0923(1)(b). It is also a deceptive trade practice when, "in the course of his or her business", a person "knowingly . . . [u]ses coercion, duress, or intimidation in a transaction" pursuant to § 598.0923(1)(d), or "knowingly . . . [u]ses an unconscionable practice in a transaction" pursuant to § 598.0923(1)(e). Finally, the elements of an NDTPA claim must be pleaded with particularity pursuant to Federal Rule of Civil Procedure 9(b). <u>Switch</u>, 426 F. Supp. 3d at 643; <u>see also</u> <u>Horner v. Mortgage Elec. Registration Sys.</u>, 711 F. App'x 817, 818 (9th Cir. 2017). In his complaint, Nolan alleges that Labcorp's use of the Patient Acknowledgment and subsequent debt collection efforts violate § 41.600 and provisions in § 598 of the NDTPA. (Doc. 1 ¶ 153-59.)

Labcorp argues that under any of these provisions Nolan's claims fail as a matter of law. First, it argues that Nolan cannot state a claim under the NDTPA because "nothing in the Patient Acknowledgment is false or misleading," nor "is a reasonable consumer likely to be detrimentally misled by anything it says." (Doc. 11 at 12-14.) Second, it argues that Nolan has failed to

13

"allege[] facts establishing causation" because the alleged injury was caused by his own "apparent assumption that . . . the amount [he] would owe would be limited to" the amount provided on the Patient Acknowledgment. (Id. at 16-17.) And third, it argues that Nolan's allegations "do not meet the heightened particularity required by Rule 9(b)." (Id. at 17.)

### 1. Claims Pursuant to §§ 598.0915(13) and (15)

First, Nolan contends that Labcorp's Patient Acknowledgment form affirmatively misleads consumers pursuant §§ 598.0915(13) and (15). "For a plaintiff to recover based on consumer fraud under the Deceptive Trade Practices Act, a plaintiff must . . . allege that they reasonably relied on the alleged misrepresentation where it is an affirmative misrepresentation rather than a failure to disclose." Sylver v. Exec. Jet Mgmt., Inc., No. 2:10-CV-01028, 2011 WL 9329, at *3 (D. Nev. Jan. 3, 2011) (citing Picus, 256 F.R.D. at 657-58); Heath v. Tristar Prod., Inc., No. 2:17-CV-2869-GMN-BNW, 2019 WL 4738004, at *10 (D. Nev. Sept. 27, 2019) ("To support a claim under the NDTPA, Plaintiff must prove that she reasonably relied on misrepresentations or false statements made by Defendant.")

Here, as Labcorp correctly points out, the Patient Acknowledgement "discloses to Plaintiffs exactly what it says it discloses: the estimated out-of-pocket charges a patient will incur for testing *if* that service is covered by the patient's

14

insurance." (Doc. 11 at 13 (emphasis in original).) Put differently, the Patient Acknowledgment explicitly states that the "health plan allowed rate" provides only an estimate based on the assumption that insurance will cover the lab tests. By definition, the "health plan allowed rate" indicates it is the most the insurer allows the provider to charge for each enumerated test if there is coverage. Accordingly, the average consumer who claims to have insurance should understand as much, and Nolan could not have reasonably relied on the Patient Acknowledgment as anything other than an estimate of his costs if there were insurance coverage. See Sylver, 2011 WL 9329, at *3 (dismissing NDTPA claim because plaintiffs could not have reasonably relied on a quote to receive a Gulfstream when the contract expressly stated that type of chartered aircraft could change); Docena v. Navy Fed. Credit Union, No. 3:15-CV-00184-LRH-WGC, 2016 WL 53826, at *4 (D. Nev. Jan. 4, 2016) (citation omitted) (dismissing NDTPA claim because "a reasonable consumer would have been put on notice simply by doing sufficient reading"); accord Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995)(affirming dismissal of unfair competition claim under California law because the allegedly misleading letter clearly and inconspicuously stated the conditions plaintiff must meet in order to qualify for the prize money).

That Nolan might not have personally read or understood the disclosure - which he signed - is immaterial. "[A] consumer cannot

15

decline to read clear and easily understandable terms that are provided on the same [page] in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the [document], which the consumer has failed to read, is deceptive." Bott v. VistaPrint USA, Inc., 392 F. App'x 327, 327-28 (5th Cir. 2010) (citation omitted); Hager v. Vertrue, Inc., No. CIV.A. 09-11245-GAO, 2011 WL 4501046, at *6 (D. Mass. Sept. 28, 2011) (dismissing unfair competition claim under Massachusetts law because the plaintiff, "[h]aving failed to read the materials the defendants provided (even fairly casually)," could "not now show the necessary connection between the allegedly deceptive materials and her mistaken enrollment such that the defendants would be responsible for the asserted harm.") In Nevada, "[i]t has long been the common law rule that signing a document authenticates and adopts the words it contains, even if there was a lack of subjective understanding of the words or their legal effect." In re Schwalb, 347 B.R. 726, 743 (Bankr. D. Nev. 2006) (citing Campanelli v. Conservas Altamira, S.A., 477 P.2d 870, 872 (Nev. 1970)). "In essence, people are presumed to be bound by what they sign." Id.

Nolan also contends that by stating that a patient's costs "may be different," the Patient Acknowledgment affirmatively

"misrepresents the truth in two ways."[3]  (Doc. 13 at 16.)  First,
Nolan argues that this statement is affirmatively misleading
because "it misrepresents the price change as being less than
certain by using the term 'may' instead of 'will,'" (id.) even
though Labcorp knows that the price will be "many times higher
than the amount quoted for covered services" in the event of non-
coverage.  (Doc. 13 at 16-17.)  Second, Nolan argues that the
phrase "may be different than the estimated amount" misrepresents
"that the change may be higher or lower than" the health plan
allowed rate, when Labcorp knows that the amount to be charged
will be higher without insurance coverage.  (Id.)

    Neither of these arguments is persuasive.  As Labcorp
correctly states in its reply, "[t]he sentence at issue asks
patients to acknowledge their understanding that, for a number of
stated reasons, the ultimate amount they may owe may not be the
same as – and thus 'different' than - the estimated insurance-
related charges."  (Doc. 15 at 4.)  In other words, this sentence
simply acknowledges the "uncertainty inherent in the estimate
provided."  (Id. at 3.)

    Moreover, the phrase "may be different" must be read in the
context of the Patient Acknowledgement as a whole in evaluating
whether a reasonable consumer is likely to be deceived.  See

---

[3] In relevant part, the specific sentence reads: "The amount I may have
to pay may be different than the estimated amount."  (Doc. 1-1 at 2.)

17

<u>Freeman</u>, 68 F.3d at 290 (evaluating allegedly deceptive statements under reasonable person standard and noting that "[a]ny ambiguity that [plaintiff] would read into any particular statement is dispelled by the promotion as a whole"); <u>Davis v. G.N. Mortg. Corp.</u>, 396 F.3d 869, 884 (7th Cir. 2005) (citations omitted) (under Illinois Consumer Fraud Act, the "allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff.") Viewed holistically, the Patient Acknowledgement purports to be nothing other than a conditional estimate. Page one unambiguously states: "This estimate assumes all services will be covered," meaning that it is the estimate of patient costs assuming all tests are covered by the patient's insurer. (<u>See, e.g.</u>, Doc. 1-1 at 1.) This disclosure is repeated on page two under the heading: "ACKNOWLEDGEMENT OF ESTIMATED FINANCIAL RESPONSIBILITY." (<u>Id.</u> at 2.) Page one, moreover, makes clear that the "Health Plan Allowed Rate" is the rate the insurer is permitted to charge, and thus the patient may owe out-of-pocket, <u>if the services are covered</u>. (<u>Id.</u> at 1.) Thus, the "Estimated Responsibility" noted on page two is merely the total of the estimates provided on page one, less any deductible or co-insurance allowance, <u>if the insurer covers the tests</u>. (<u>Id.</u>) For Nolan to have assumed that he would be charged the "Health Plan Allowed Rate" even if the charges were <u>not</u> covered by his insurance is not a reasonable assumption based on a fair reading of the form.

18

Similarly, there is no reasonable basis for any inference that the patient would ever owe anything less than the Estimated Responsibility amount if his health insurance did not cover each test. The form explains why certain services might not be covered by health insurance: because, for instance, they "may be considered investigational, require prior authorization, [or] are excluded or otherwise not covered by your health plan." (Id.) Additionally, the final sentence reads, "I agree to be personally and fully responsible for the charges from today's services that are not covered by my health plan." (Id.) Thus, the totality of the information available on the form dispels any basis for Nolan's claim that the form has a tendency to deceive. Accordingly, Nolan's allegations based on §§ 598.0915(13) and (15) fail to state a claim on which relief may be granted.

### 2.    Claim Pursuant to § 598.0923(1)(b)

Next, Nolan alleges that Labcorp's "fail[ure] to disclose to patients the patient list price that patients would be required to pay if insurance denies coverage" (Doc. 1 ¶ 156) violates § 598.0923(1)(b), which makes it a deceptive trade practice to "knowingly . . . fail[] to disclose a material fact in connection with the sale or lease of goods or services." In its reply brief, Labcorp argues that because Nolan failed to allege this specific provision of the NDTPA in the complaint (and instead merely alleges a general violation of Chapter 598), he should be precluded from

19

relying on that section now. (See Doc. 15 at 5.)

Labcorp is correct that the complaint does not specifically allege a violation of § 598.0923(1)(b). And to be sure, a complaint may not be amended by a brief in opposition to a motion to dismiss. See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013). This rule stems from the requirement that the "complaint . . . give the defendant fair notice of what the claim is and the grounds upon which it rests." E.I. du Pont, 637 F.3d at 440. Here, although Nolan does not specify § 598.0923(1)(b) in the complaint, he does allege "violations of 598.0903, et seq." (See Doc. 1 at 41.) Moreover, the complaint clearly alleges Labcorp's "fail[ure] to disclose to patients the patient list price" alongside the health plan allowed rate as the primary theory of liability. (See Doc. 1 ¶ 156; see also id. ¶¶ 3, 128.) Furthermore, the "failure to disclose" allegations of the complaint track the text of § 598.0923(1)(b) itself, which makes it a deceptive trade practice to "knowingly . . . fail to disclose" certain material facts. That Labcorp acknowledged (and fully briefed) this self-described "deception-by-omission theory" (Doc. 11 at 14-15), further belies any argument that it lacked fair notice of the claim and the grounds upon which it rested. E.I. du Pont, 637 F.3d at 440; see also (Doc. 11 at 2) (Labcorp characterizing Nolan's "claim" as resting on the fact that the Patient Acknowledgment "does not

20

<u>disclose</u> the specific amount a patient might pay if their test is not covered by his or her health plan.") Accordingly, the allegations were sufficient to give Labcorp notice of the provision of the law it allegedly violated, § 598.0923(1)(b).[4]

Turning to the claim itself, this federal court sitting in diversity and applying Nevada law is obliged to apply the jurisprudence of Nevada's highest court, the Supreme Court of Nevada. <u>See</u> <u>Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.</u>, 296 F.3d 308, 312 (4th Cir. 2002). When that court has not spoken directly on an issue, this court must "predict how that court would rule if presented with the issue." <u>Id.</u> The decisions of the Nevada Court of Appeals are the "next best indicia" of what Nevada's law is, though its decisions "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." <u>Id.</u> (quoting <u>Liberty Mut. Ins. Co. v. Triangle Indus., Inc.</u>, 957 F.2d 1153, 1156 (4th Cir. 1992)). In predicting how the highest court of a state would address an issue, however, this court

---

[4] Alternatively, because this alleged deficiency is easily correctible by amendment, the parties have briefed the issue, and to conserve judicial and party resources, the court would reach the same conclusion and exercise its discretion to determine whether the complaint states a claim under § 598.0923(1)(b). <u>See</u> <u>Poindexter v. Stuteville</u>, No. CIV-12-0031-F, 2012 WL 13035041, at *4 (W.D. Okla. May 10, 2012) (electing to address whether the allegations stated a claim under § 1962(c) despite complaint's failure to specify which subsection of § 1962 defendant allegedly violated because the issue was fully briefed and deciding it would conserve resources).

21

"should not create or expand a [s]tate's public policy." <u>Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.</u>, 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted). Moreover, "absent a strong countervailing federal interest," a federal court should not interject itself into a controversy to render what may be an "uncertain and ephemeral interpretation of state law." <u>Id.</u>; <u>see</u> <u>Burris Chem., Inc. v. USX Corp.</u>, 10 F.3d 243, 247 (4th Cir. 1993) (noting that federal courts adjudicating issues of state law "rule upon state law as it exists and do not surmise or suggest its expansion").

Here, the parties have not identified a case to support a duty to disclose price to a customer under Nevada law. Labcorp cites <u>Mallory v. McCarthy & Holthus, LLP</u>, No. 2:14-CV-00396-KJD, 2015 WL 2185413, at *3 (D. Nev. May 11, 2015), which dismissed NDTPA claims because plaintiff did "not identify how Defendant is bound, under Nevada law, to disclose the information" allegedly omitted. However, those claims were brought under § 598.0915(15), which addresses affirmative representations. A similar result appears in <u>MST Management, LLC v. Chicago Doughnut Franchise Co., LLC</u>, 584 F. Supp. 3d 923, 933 (D. Nev. 2022), which dismissed NDTPA claims based on "alleged omissions" on the grounds that the plaintiff failed to identify or argue the existence of a duty to disclose under "the DTPA, other state law, or the contracts between the parties," but permitted plaintiffs' affirmative

22

misrepresentation claims to proceed. While not apparent in the court's opinion, the parties' briefs indicate that the plaintiffs' claims were brought pursuant to §§ 598.0915(5), (7), and (15), which all address affirmative representations. These cases are therefore not on point.

Nolan relies heavily on Poole v. Nevada Auto Dealership Investments, LLC, 449 P.3d 479 (Nev. App. 2019). In Poole, the plaintiff purchased a certified pre-owned truck from the defendant-dealer. Id. at 481. Before purchasing the truck, the plaintiff asked about the truck's accident history and was told it had been in a "minor" accident. Id. He was also told that the defendant "would not sell the truck were the collision significant." Id. Two years later, when attempting to refinance the truck loan, the plaintiff learned that the truck had in fact been in a major accident resulting in significant damage, thereby "significantly" affecting the value of the truck. Id. at 481-82. The plaintiff sued for "failing to disclose a material fact" under § 598.0923(2) of the NDTPA, the substantively identical predecessor to § 598.0923(1)(b). On appeal, the Nevada Court of Appeals held that the plaintiff had presented sufficient evidence to create a factual dispute and reversed the lower court's grant of summary judgment. Id. at 490-91.

While the court of appeals analyzed Poole's claim under the rubric of nondisclosure, see id. at 488 (characterizing

defendant's failure as not disclosing "the extent of the damage" to the car), plaintiff's claim clearly rested on the defendant's prior affirmative misrepresentation. As the Nevada Court of Appeals recounted, plaintiff's evidence (viewed in the light most favorable to him at the summary judgment stage) established that the defendant auto-dealer affirmatively misled the plaintiff about the truck's condition when its employee lied to him: when asked about the car's previous collision, the salesperson "assured [Poole] that the collision was only minor," when in fact that salesperson knew that the prior collision "had damaged the truck's frame and significantly reduced its value." Id. at 481. Poole is therefore distinguishable, as its holding relied on an affirmative misrepresentation.

The court's own analysis reveals one federal case interpreting Nevada law that denied a motion to dismiss a claim under § 598.0923(1)(b) where the defendant argued that the statute requires an affirmative duty to disclose. In Smallman v. MGM Resorts International, No. 220CV00376GMNEJY, 2022 WL 16636958, at *12 (D. Nev. Nov. 2, 2022), plaintiffs brought a claim under § 598.0923(1)(b) against the defendant hotel alleging a failure to disclose its allegedly deficient data security practices and likelihood of being a frequent target of sophisticated cyberattacks. The federal court distinguished another Nevada district court decision, Soffer v. Five Mile Capital Partners,

LLC, No. 12-CV-1407, 2013 WL 638832, at *10 (D. Nev. Feb. 19, 2013), cited by the defendant, which observed that, under Nevada law, common law fraud by omission requires an affirmative duty to disclose. Id.[5] The Smallman court also noted the Nevada Supreme Court's general statement that "[s]tatutory offenses that sound in fraud are separate and distinct from common law fraud." Id. (quoting Leigh-Pink v. Rio Properties, LLC, 512 P.3d 322, 328 (Nev. 2022)).[6] Based on these two observations, the Smallman court concluded that the defendant "has not shown that fraud by omission

---

[5] See, e.g., Dow Chem. Co. v. Mahlum, 970 P.2d 98, 110 (Nev. 1998) (common law fraud requires duty to disclose), abrogated on other grounds by GES, Inc., v. Corbitt, 21 P.3d 11 (Nev. 2001). Nevada's common law on duty to disclose in omission cases is consistent with the law of other jurisdictions. See, e.g., Chiarella v. United States, 445 U.S. 222, 228 (1980) (noting that at common law, fraud doctrine did not impose a duty to disclose in the absence of a fiduciary or other similar relation of trust and confidence); Eller v. EquiTrust Life Ins. Co., 778 F.3d 1089, 1092 (9th Cir. 2015) (noting "the settled premise that a seller generally has no duty to disclose internal pricing policies or its method for valuing what it sells"); Langford v. Rite Aid of Alabama, Inc., 231 F.3d 1308, 1313-14 (11th Cir. 2000) (rejecting claim that federal law obliges retailers to disclose pricing structure to consumers); Bonilla v. Volvo Car Corp., 150 F.3d 62, 71 (1st Cir. 1998) (also finding that federal law imposes no obligation on retailers to disclose their pricing structure to consumers, and rejecting fraud claim based on contention that car buyers would not have paid for accessories had they known the seller's mark-up was so high and the accessories so minor).

[6] Leigh-Pink involved a damages question, not a duty to disclose. The Nevada Supreme Court went on to state that "statutes should be interpreted consistently with the common law," and noted that its interpretation of Nev. Rev. Stat. § 41.600(3) in that case had the "salutary purpose of coupling the statutory consumer fraud understanding of damages with this court's determination of damages at common law." 512 P.3d at 328 (quoting in part Samantar v. Yousuf, 560 U.S. 305, 320 (2010)). The Leigh-Pink court concluded that while the NDTPA should be construed liberally to accord with its remedial purposes, "such a liberal construction must be faithful to the first principles of statutory interpretation" requiring application of the plain language of the statute "in accord with the term's definition at common law." Id.

25

under NRS § 598.0923(1)(b) requires an affirmative duty to disclose." Id.

Other states with similar, but perhaps not identical, statutes differ as to whether a duty to disclose is required for a statutory omission claim. For example, Arizona courts are split on whether a duty to disclose is required. Compare Tavilla v. Cephalon, Inc., 870 F. Supp. 2d 759, 776 (D. Ariz. 2012) (citations omitted) ("Generally stated, claims under the [Arizona Consumer Fraud Act], like common law fraud claims, can be based on . . . omission of material facts," but "[t]o the extent that 'omission' suggests that mere silence as to material facts may be actionable without a duty to disclose, the Arizona Court of Appeals has rejected this interpretation.") and Loomis v. U.S. Bank Home Mortg., 912 F. Supp. 2d 848, 857 (D. Ariz. 2012) (same); with Cheatham v. ADT Corp., 161 F. Supp. 3d 815, 830 (D. Ariz. 2016) (arguing that Loomis "misapprehended Arizona law" and ignored the Arizona Supreme Court's decision in State ex rel. Horne v. AutoZone, Inc., 275 P.3d 1278, 1281 (Ariz. 2012)).[7] Michigan

---

[7] Ariz. Rev. Stat. Ann. § 44-1522 provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression *or omission of any material fact with intent that others rely on such concealment, suppression or omission*, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

26

courts appear to require a duty to disclose. See, e.g., Hendricks v. DSW Shoe Warehouse Inc., 444 F. Supp. 2d 775, 782 (W.D. Mich. 2006) (interpreting the Michigan Consumer Protection Act, which proscribes "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer," and concluding that Michigan courts would not recognize a claim under this provision for an omission "in the absence of a duty of disclosure").[8] Kansas courts similarly appear to require a duty to disclose. See, e.g., Williamson v. Amrani, 152 P.3d 60, 73 (Kan. 2007) (concluding that in order for failure to disclose a material fact to constitute a deceptive act under the Kansas Consumer Protection Act,[9] "there must be a duty to disclose the fact"), superseded by statute on other grounds, Kan. Stat. Ann. § 50-635(b), as recognized in Kelly v. VinZant, 197 P.3d 803, 811 (Kan. 2008); Nieberding v. Barrette Outdoor Living, Inc., 302 F.R.D. 600, 614 (D. Kan. 2014) ("To make a willful omission claim under § 50-626(b)(3)" the "[p]laintiff also must show that defendants had a duty to disclose the material fact."). New

---

[8] The Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.903, defines unfair or deceptive acts to include "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not be known by the consumer."

[9] Kan. Stat. Ann. § 50-626(b)(3) defines deceptive acts and practices to include "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."

Mexico, by contrast, may not require an independent duty to disclose.  See, e.g., Smoot v. Physicians Life Ins. Co., 87 P.3d 545, 549 (N.M. Ct. App. 2003) (holding that N.M. Stat. Ann. § 57-12-2(D)(14) "imposes a duty to disclose material facts reasonably necessary to prevent any statements from being misleading").[10]

Based on the limited authority provided, it is not clear how the Nevada Supreme Court would interpret the duty to disclose in the present case, where an accurate estimated price was in fact disclosed based on a representation and assumption that the patient/customer had insurance coverage.  Even assuming § 598.0923(1)(b) imposes a duty to disclose of some form, however, this federal court sitting in the Middle District of North Carolina declines to presume that the Nevada Supreme Court would extend the statute to the claim in this case.  Time Warner Ent.-Advance/Newhouse P'ship, 506 F.3d at 314 (noting federal court sitting in diversity should not "elbow its way" into a controversy that might create or expand a state's public policy); see Bauer v. Charter Sch. USA, Inc., No. 5:21-CV-492-FL, 2022 WL 2721339, at *3 (E.D.N.C. July 13, 2022) (same).  Nolan's claim is predicated on his representations to Labcorp that he had insurance for his testing and the identity of his insurer.  The Patient

_____

[10] N.M. Stat. Ann. § 57-12-2(D)(14) includes within its definition of unfair trade practices "failing to state a material fact if doing so deceives or intends to deceive."

Acknowledgement is a response to that request, and thus discloses the estimated prices he may be charged should his representations be correct and should the tests be covered by his insurance - contingencies that are disclosed in the Patient Acknowledgement. Nolan does not allege that the estimated prices are misleading if the tests are in fact covered by his insurance; put differently, there is no allegation that Labcorp failed to disclose the proper price based on Nolan's representations. Nowhere does Labcorp represent that the tests will in fact be covered, nor does Nolan represent that Labcorp knows that the test will not be covered. Other prices could apply depending on, among other factors, how much the insurance company later deems covered and what insurance benefits the patient has purchased (including whether the service is in-network). To hold that under these circumstances - where a customer/patient represents he has insurance - a provider must disclose the possible list price would, by implication, subject the provider to liability for not disclosing all other possible prices and impose a heavy burden on service providers that it would seem the law has heretofore not contemplated.[11]    Accordingly,

---

[11] It is well-established, for instance, that in the context of providing for health care services "precision concerning price is close to impossible." Allen v. Clarian Health Partners, Inc., 980 N.E.2d 306, 310 (Ind. 2012); see Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 193 (N.D. 2007) (noting that "in a hospital setting, it is not possible to know at the outset what the cost of the treatment will be"); Shelton v. Duke Univ. Health Sys., Inc., 633 S.E.2d 113, 116 (N.C. Ct. App. 2006) ("Inherent in providing medical care and treatment is the

Nolan's reliance on § 598.0923(1)(b) is unavailing.

### 3. Claims Pursuant to §§ 598.0923(1)(d) and (e)

Nolan next claims that Labcorp's debt collection practices were coercive in violation of Nev. Rev. Stat. § 598.0923(1)(d). He concedes that it is not "inherently coercive" to report unpaid debts to credit bureaus or collection agencies. (Doc. 13 at 18.) He argues, however, that Labcorp's practice of using "non-physical threats to compel compliance with its wrongful demand that he pay its inflated PLP for the Vitamin D test" violated the statute. (Id.) Labcorp responds that Nolan has failed to plead a claim under § 598.0923(1)(d) in the complaint and raised this claim for the first time in his response brief. (Doc. 15 at 9-12.) Labcorp also argues that it cannot be coercive or wrongful to seek collection of the list price. (Id. at 12.)

The statute provides that a person engages in a deceptive trade practice when "in the course of his or her business he or

element of the unforeseen."). For this reason, courts have routinely rejected the argument that healthcare contracts that fail to specify price upfront are unenforceable. See DiCarlo v. St. Mary Hosp., 530 F.3d 255, 264 (3d Cir. 2008)("Besides handing the patient an inches-high stack of papers detailing the hospital's charges for each and every conceivable service, which he or she could not possibly read and understand before agreeing to treatment, the form contract [explaining that the price term is "all charges"] employed by [defendant] is the only way to communicate to a patient the nature of his or her financial obligations to the hospital."); Allen, 908 N.E.2d at 309-311 (collecting cases); Pitell v. King Cnty. Pub. Hosp. Dist. No. 2, 423 P.3d 900, 902 (Wash. Ct. App. 2018) (collecting cases); Mark A. Hall and Carl E. Schneider, Patients as Consumers: Courts, Contracts, and the New Medical Marketplace, 106 Mich. L. Rev. 643, 674 (2008) (explaining that "courts have generally tolerated low levels of specificity in medical contracts").

she knowingly . . . [u]ses coercion, duress or intimidation in a transaction." Nev. Rev. Stat. § 598.0923(1)(d).  It is true that while the complaint contained allegations referencing Labcorp's collection efforts, Nolan's articulation of this claim arose for the first time in his response brief; Count I of the complaint contains no reference to any specific alleged statutory violation. As one federal district court in Nevada has explained, "[m]erely alleging a general violation of Chapter 598 is insufficient to give the defendants notice of the prohibited conduct they engaged in or the provisions they allegedly violated." Laforge v. Richland Holdings, Inc., No. 2:17-CV-00782, 2018 WL 525298, at *8 (D. Nev. Jan. 23, 2018) (noting that "Chapter 598 contains ten sections, each defining a separate set of deceptive practices," and "[e]ach of those sections further enumerates categories of conduct, some identifying as many as 16 sub-categories of prohibited acts"); see Austin v. Allied Collection Servs., Inc., No. 221CV01593CDSNJK, 2023 WL 375988, at *5 (D. Nev. Jan. 23, 2023) ("But plaintiff is required to, at the very least, cite which specific subsections of the [NDTPA] she accuses the defendants of violating, to place the defendants on notice.")  Nolan's claim was therefore not properly pleaded.

Nolan also raises an unconscionability claim pursuant to § 598.0923(1)(e).  The court finds that this pleading was defective.  In his response brief, Nolan attempts to supplement

31

the allegations of the complaint by claiming that Labcorp's "actions after October 21, 2021, constitute the use of 'an unconscionable practice in a transaction.'" (Doc. 13 at 19 (quoting Nev. Rev. Stat. 598.0923(1)(e)). The complaint, however, does not include any allegation involving conduct after October 2021. This is unsurprising, as that section of the statute was not added by amendment until October 1, 2021, and therefore Labcorp could not have violated it as to Nolan's September 2018 interaction with Labcorp. See Nev. Rev. Stat. Ann. § 598.0923 (West 2021) (effective date October 1, 2021). Nolan argues, nevertheless and in conclusory fashion, that the Patient Acknowledgement is "unconscionable" because it facilitates Labcorp's practice of charging patients for tests at prices that grossly exceed their market value. (Id.) A "proffered argument is not a pleaded factual allegation." Mack v. E. Carolina Univ., No. 4:21-CV-00108-M, 2022 WL 945595, at *6 (E.D.N.C. Mar. 29, 2022). For these reasons, the court will not consider Nolan's contention that Labcorp has violated § 598.0923(1)(e) as to him. See Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"). Accordingly, to the extent Nolan contends he has such a claim, it will be dismissed without prejudice.

### 4. Conclusion

In sum, Nolan's complaint does not contain factual allegations to support a plausible claim that Labcorp engaged in a deceptive trade practice under the NDTPA. Accordingly, Count I will be dismissed for failure to state a claim upon which relief can be granted, except for Nolan's argued claims based on §§ 598.0923(1)(d) and (e), which will be dismissed without prejudice.

### C. Florida Deceptive and Unfair Trade Practices Act Claim

Pursuant to the FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are ... unlawful." Fla. Stat. § 501.204(1). The three elements of a consumer claim under the FDUTPA are: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Marrache v. Bacardi U.S.A., Inc., 17 F.4th 1084, 1097–98 (11th Cir. 2021); see also City First Mortg. Corp. v. Barton, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008).

A deceptive act "occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003) (citation and internal quotation marks omitted). "An objective test is used to determine whether an act is deceptive

33

under FDUTPA, and 'the plaintiff must show that the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" Marrache, 17 F.4th at 1098 (quoting Carriuolo v. Gen. Motors Co., 823 F.3d 977, 985-86 (11th Cir. 2016)). To establish an unfair practice, "the plaintiff must show that it is 'one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" Marrache, 17 F.4th at 1098 (quoting PNR, 842 So. 2d at 777). Whether the alleged facts constitute a deceptive or unfair act is a question of law for the court. See PNR, 842 So. 2d at 777 n.2 (stating that the relevant question is whether plaintiff pleaded conduct that is "unfair or deceptive as judged by controlling case law"); Casey v. Fla. Coastal Sch. of L., Inc., No. 3:14-CV-1229-J-39PDB, 2015 WL 10096084, at *6 (M.D. Fla. Aug. 11, 2015), report and recommendation adopted, No. 3:14-CV-01229, 2015 WL 10818746 (M.D. Fla. Sept. 29, 2015) ("Whether an alleged act or practice is deceptive or unfair may be decided as a matter of law"); Zambrano v. Indian Creek Holding, LLC, No. 09-20453-CIV, 2009 WL 2365842, at *1 (S.D. Fla. July 30, 2009) (same).[12]

---

[12] Though neither party discusses them in their briefing, a few cases contain language to the effect that whether an act is unfair or deceptive is "generally" a question of fact. See, e.g., Gov't Emps. Ins. Co. v. Glassco Inc., No. 8:19-CV-1950-KKM-JSS, 2021 WL 4391717, at *16 (M.D. Fla. Sept. 24, 2021) (citing Suris v. Gilmore Liquidating, Inc., 651 So. 2d 1282, 1283 (Fla. Dist. Ct. App. 1995)); Siever v. BWGaskets, Inc.,

Plaintiff Wittenberg alleges that Labcorp's use of the Patient Acknowledgment is both deceptive and unfair. (Doc. 1 ¶¶ 162-63.) In support of these claims, she argues that despite its plain language, the Patient Acknowledgment is nonetheless deceptive and unfair under the FDUTPA because Labcorp "knows and fails to disclose that the amount it bills patients if insurance does not cover the test is many multiples [more] than the disclosed amount." (Doc. 1 ¶ 3, 163; Doc. 13 at 25-26.) In other words, Wittenberg's theory is one of deception by omission: that Labcorp's failure to disclose the patient list price in conjunction with the health plan allowed rate constituted a deceptive act or unfair practice under Florida law.[13] (Doc. 1 ¶¶ 114-15, 163; Doc. 13 at 18.)

It is unclear whether Wittenberg must establish an independent duty to disclose on a FDUTPA claim based on an omission

---

669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009)) (same). A close reading of Suris, on which these cases rely, clarifies this inference. In Suris, the court reversed a directed verdict for the auto-dealer defendant because the conduct alleged, if believed by a jury, could constitute a FDUTPA claim. In other words, the court found that there was a factual question as to whether the alleged conduct occurred, not whether the conduct constituted an unfair and deceptive practice. Moreover, any inference that the question of whether conduct falls under the FDUTPA is a question of fact is dispelled by the Florida Supreme Court's observation that the FDUTPA "only reaches conduct that is unfair or deceptive as judged by controlling case law." PNR, 842 So. at 777 n.2.

[13] As noted, deception under the FDUTPA may be accomplished through omissions "rather than outright false statements." See Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs, State of Fla., 761 So.2d 1256, 1264 (Fla. Dist. Ct. App. 2000).

affirmatively used to mislead.  See Virgilio v. Ryland Group, Inc., 680 F.3d 1329, 1337-38 (11th Cir. 2012) (declining to decide "whether or not a duty to disclose is an element of a FDUTPA claim" based on an omission); Coffey v. WCW & Air, Inc., No. 3:17-CV-90-MCR-CJK, 2018 WL 4154256, at *4 (N.D. Fla. Aug. 30, 2018) (noting that it is undecided whether a duty to disclose is an element of a FDUTPA claim based on an omission); compare Morris v. ADT Sec. Servs., 580 F. Supp. 2d 1305, 1310 (S.D. Fla. 2008) (holding that "a duty to disclose is not an element of FDUTPA"); with Parziale v. HP, Inc., 445 F. Supp. 3d 435, 444 (N.D. Cal. 2020) (holding the opposite).

However, even assuming a duty to disclose is not an element of an FDUTPA claim based on an omission, Wittenberg has failed to plausibly allege that the Patient Acknowledgment - taken as a whole - "was likely to deceive a consumer acting reasonably in the same circumstances." Carriuolo, 823 F.3d at 983-84 (quoting State, Office of the Att'y Gen. v. Commerce Comm. Leasing, LLC, 946 So.2d 1253, 1258 (Fla. Dist. Ct. App. 2007)).  As noted in connection with Nolan's claim, by its terms the Patient Acknowledgement provides an estimate of the rate charged "assum[ing] all services will be covered" by the patient's insurer. (Doc. 1-2 at 2.)  There are no assurances that health insurance will cover the tests, and there are no assurances the estimate will be the ultimate amount for which the patient is financially responsible. (Id.)  To the

36

contrary, the Patient Acknowledgment explains that "the amount [you] may have to pay may be different than the estimated amount." (Doc. 1-1 at 2; Doc. 1-2 at 2; Doc. 1-3 at 2), and it details why certain services might not be covered by health insurance - they "may be considered investigational, require prior authorization, are excluded or otherwise not covered by your health plan." (Id.) By signing the Patient Acknowledgment, moreover, each patient agrees "to be personally and fully responsible for charges from today's services that are not covered by your health plan." (Id.) This qualifying language is neither hidden nor unreadable; rather, it appears immediately above the signature line that Wittenberg was required to sign before she submitted to her lab tests. (Id.)

In light of these provisions, no reasonable consumer would believe that the Patient Acknowledgement provided anything other than a price estimate based on the assumption, presented by Wittenberg, that she had health insurance, and that her health insurance would cover each test. See Zlotnick v. Premier Sales Grp., Inc., 480 F.3d 1281, 1285 (11th Cir. 2007) (holding that the plaintiff failed to properly allege the elements of a FDUTPA claim where the "express terms of the reservation agreement" undermined the claim that the agreement was deceptive); Piescik v. CVS Pharmacy, Inc., 576 F. Supp. 3d 1125, 1133 (S.D. Fla. 2021) (dismissing FDUTPA claim for "fail[ing] to plead a deceptive act" because a "reasonable consumer would not be expected to ignore"

37

the "accurate information" disclosed on the label); St. Francis Holdings, LLC v. Pawnee Leasing Corp., No. 8:20-CV-1101-T-02, 2020 WL 6287684, at *6 (M.D. Fla. Oct. 27, 2020)(holding that the defendant's actions did "not amount to a deceptive or unfair trade practice [pursuant to FDUTPA] because the terms of the agreement were clear and Plaintiffs . . . voluntarily agreed to them").

It is true that the Patient Acknowledgment does not disclose the patient list price, or that the patient list price would likely be higher than the health plan allowed rate. But the explicit disclaimer that the amount due "may be different than the estimated amount," along with the admonition that the patient would be "personally and fully responsible for charges from today's services that are not covered by your health plan," is more than sufficient to counter any potential misconception about the health plan allowed rate disclosed on page one of the Patient Acknowledgment. See Zlotnick, 480 F.3d at 1284 (holding that the relevant standard "requires a showing of probable, not possible, deception.") For Wittenberg to now claim the Patient Acknowledgement led her astray is unavailing, and she cannot "reasonably claim that such clear and unambiguous statements were deceiving." Beale v. Biomet, Inc., 492 F. Supp. 2d 1360, 1374 (S.D. Fla. 2007). Accordingly, Wittenberg has not alleged sufficient facts showing that Labcorp's Patient Acknowledgement is "likely to cause injury to a reasonable relying consumer,"

Zlotnick, 480 F.3d at 1284 (quoting Millennium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen., 761 So.2d 1256, 1263 (Fla. Dist. Ct. App. 2000)), and therefore has not plausibly alleged the existence of a "deceptive act" under the FDUTPA.

Wittenberg's contrary arguments are unconvincing. Wittenberg primarily relies on State Farm Mut. Auto. Ins. Co. v. At Home Auto Glass LLC, No. 8:21-CV-239-TPB-AEP, 2021 WL 6118102, *1 (M.D. Fla. Dec. 27, 2021), which she contends establishes that "[a]n allegation of 'charging inflated prices not disclosed to the customer' is sufficient to state a claim under the Florida Act." (Doc. 13 at 17, 20 (quoting State Farm, 2021 WL 6118102 at *5).) This reading of State Farm, however, is out of context. There, unlike here, the defendant's alleged practice of charging customer's undisclosed amounts resulted from a deliberate and "orchestrated scheme" of affirmative acts which included "falsifying information [in] its application to register as a repair shop, concealing information about its business operations, failing to provide customers with written estimates, misrepresenting the nature of the repair charges and the hours spent on repairs, and falsely telling the customer that the repairs would be free or at no cost to them." State Farm, 2021 WL 6118102 at *1, *6. Suffice it to say that no such allegations are made here.

Wittenberg's citation to Department of Legal Affairs v.

39

*Father & Son Moving & Storage, Incorporated*, 643 So.2d 22 (Fla. Dist. Ct. App. 1994), is similarly unpersuasive. There, the Florida District Court of Appeals simply held that a whether a defendant violated a "specific rule or regulation is not necessary to the determination of what constitutes an unfair or deceptive practice" under the FDUTPA. (*Id.* at 24.) The court remanded the case to the trial court to determine whether the defendant's actions could nevertheless constitute an unfair and deceptive trade practice in the absence of an "administrative rule or regulation specifying that the conduct of [the defendant] was prohibited." (*Id.* at 26.) In other words, the case merely establishes that a plaintiff need not prove that a defendant violated a statute or rule to state a claim under the FDUTPA. Thus, contrary to Plaintiff's assertions, *Father & Son Moving* fails to establish that "Labcorp's actions are similar to those that have previously been held sufficient to state a claim under the Florida Act." (Doc. 13 at 17.)

Wittenberg has also failed to allege sufficient facts showing that Labcorp's use of the Patient Acknowledgment constitutes an "unfair practice." See *PNR*, 842 So. 2d 773, 777 (Fla. 2003) (stating that under the FDUTPA, an unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.") Nowhere does Wittenberg explain how the Patient

40

Acknowledgment violates established public policy. See Warren Tech., Inc. v. UL LLC, No. 1:18-CV-21019-UU, 2018 WL 10550930, at *11 (S.D. Fla. Oct. 31, 2018), aff'd, 962 F.3d 1324 (11th Cir. 2020) (dismissing FDUTPA claim where plaintiffs failed to explain how defendant had violated established public policy). Nor has Wittenberg alleged facts showing that Labcorp violated her rights in an immoral, deceitful, or unscrupulous way. See Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc., 270 F. Supp. 3d 1340, 1353 (S.D. Fla. 2017) (dismissing FDUTPA claim on this ground). As with Nolan's claim, Wittenberg's claim is predicated on her representations to Labcorp that she has insurance for her testing and the name of the insurer. The Patient Acknowledgement accurately discloses the estimated prices she may be charged should her representations be correct and if the tests are covered by her insurance. Wittenberg does not allege that the estimated prices are incorrect if the tests are in fact covered by his insurance. In this respect, Labcorp disclosed the proper price based on the representations made by Wittenberg. Thus, Wittenberg has also failed to plausibly allege the existence of an "unfair practice."

For these reasons, Wittenberg has failed to state a claim under the FDUTPA. Count II will therefore be dismissed with prejudice.

## III. CONCLUSION

For the reasons set forth above,

41

IT IS ORDERED that Defendant's motion to dismiss (Doc. 10) is GRANTED and that all claims are DISMISSED WITH PREJUDICE except for those by Plaintiff Nolan based on alleged violations of Nev. Rev. Stat. §§ 598.0923(1)(d) and (e), which are DISMISSED WITHOUT PREJUDICE.

/s/   Thomas D. Schroeder
United States District Judge

February 13, 2023